The CITY OF HOUSTON, Appellant,

v.

HOWE & WISE, Appellee.

No. 14188.

Court of Civil Appeals of Texas.

Houston.

Dec. 5, 1963.

Rehearing Denied Jan. 9, 1964.

R. H. Burks, City Atty., Homer T. Bouldin, Edgar Pfeil, Senior Asst. City Attys., Houston, for appellant.

Fred Parks and Donn C. Fullenweider, Houston, for appellee.

COLEMAN, Justice.

This is the second appeal of a suit on a contract to recover fees alleged to be due for supervisory engineering services. On this trial the issues were confined to the liability of the City for fees alleged to be due in connection with the removal and relocation of certain railroad property. The opinion of this Court on the previous appeal is reported under the style of City of Houston v. Howe & Wise, 323 S.W.2d 134.

The controversy grows out of a letter by the terms of which appellees waived

their right to fees, to which they might become entitled under their contract, for services to be performed in connection with the removal and relocation of such railroad property as would be made necessary by the construction of Lake Houston, conditioned on their not being required to perform such services. A railroad bridge was subsequently relocated and appellees performed no services referable to this work.

Appellees alleged in effect that they were induced to eliminate this railroad work from their contract by fraudulent misrepresentations. In answer to special issues the jury found that F. N. Baldwin, Director of Utilities for the City of Houston, told W. F. Smith, a partner in the firm of Howe & Wise, that the City would not pay more than $50,000.00 to the Beaumont, Sourlake & Western Railway Company in connection with their railway bridge; that this representation was false; that F. N. Baldwin knew that this representation was false; that W. F. Smith would not have executed the waiver letter had such representation not been made; that in making the representation it was the intention of F. N. Baldwin to induce W. F. Smith to sign a letter purporting to waive his fee for the removal and relocation of the railroad bridge; and that W. F. Smith signed the waiver letter relying on such representation.

By written contract the City of Houston employed Howe & Wise to perform the engineering services, incident to the clearing of the Lake Houston reservoir area and "the removal, rearrangement and/or relocation of a railroad and certain pipelines which cross the reservoir area, including the area on which the dam itself will actually rest." The contract provided:

"While for convenience the engineer's services in connection with the clearing and in connection with the removal of such existing facilities or their rearrangement, etc., will be separately described, this is a single entire employment for the entire engineering services involved in all the work herein referred to."

Other portions of the contract pertinent to the questions involved herein follow:

"B.

"*Supervising the Rearrangement, Removal or Relocation of the Railroad and Pipelines.*

"Under this part of the Engineer's employment, he will, working in close cooperation with the City's Director of Utilities and/or the City's Legal Department, perform in general the following services, to-wit,—

"As stated above, there is a railroad and a large number of pipelines which cross the reservoir area. Agreements have not yet been reached between the City and the owners of these facilities as to the extent to which they may severally remain in their present location with or without any rearrangement or any additional construction. Similarly, no decision or agreement has yet been reached, and many months may be required before agreements are reached, as to the extent, if any, to which the cost of any removal, relocation or rearrangement of such facilities will be borne by the City. It is possible that some of the facilities, particularly the railroad, will simply be abandoned and nothing done except to tear up the tracks so far as involves the reservoir area. Similarly, some of the pipelines may be simply abandoned and by-passed. In connection with others, they may be placed in trestles and carried across the reservoir in that manner while as to others, they may be left in the ground but first strengthened by additional construction, weighting, or other construction work.

"It is the Engineer's responsibility when a decision is reached that a certain existing facility will remain where it is but that certain construction work or relocation or strengthening will be done, to supervise generally the work which is done and see to it that it is done in such manner as to

involve the minimum of danger to the City's reservoir. On the other hand, where an existing facility is simply to be removed, the Engineer will have no responsibility except to see to it that the removal is in such manner as does not endanger the City's reservoir or leave the ground in such condition as to constitute a future hazard or danger. The same shall apply to the simple abandonment of the railroad with the removal, however, if the railroad company sees fit, of its tracks and/or its present railway bridge across the San Jacinto River.

"The City and the Engineer both realize that the foregoing description of the Engineer's services and duties under this part of his employment is extremely general. It shall, however, be fairly construed to require the Engineer in connection with the work actually done in the matter of the present facilities within the reservoir area to perform those engineering services which the City in ordinary prudence would find it necessary to perform for itself if this agreement had not been entered into.

" *  *  *

## "III.

### "Co-operation with the City.

"In the performance of his duties and particularly in the matter of the preparation of the clearing specifications and the approval of work proposed to be done or done in connection with the present utilities within the reservoir area, the Engineer will hold periodic conferences with the Mayor or with the City's Director of Utilities to the end that the project as perfected will have full benefit of the City's accumulated experience and knowledge of existing needs and facilities and be consistent with current municipal policy. To implement this co-ordination, the City will make available to the Engineer all of its existing plans, maps, field notes, statistics, computations and other data relative to the entire project.

## "IV.

### "Time for Performance of Services.

"The City presently hopes to be able to award a contract for the actual construction of its dam about or shortly after the middle of the year 1951. *  *  *

" *  *  *

"The Engineer's services in connection with the rearrangement, removal or relocation or abandonment of the existing utilities within the reservoir area will, of course, be performed as the necessity therefor arises, depending upon the agreements which from time to time are reached between the City and the owners of such facilities as to what is going to be done about them.

## "V.

"FEES: For and in consideration of the services to be rendered by the Engineer, the Engineer shall receive a fee which shall be five per cent (5%) of the actual cost to the City of the work of clearing of the reservoir site and of the rearrangement, removal or replacement of the railroad and/or the pipelines within the reservoir area.

" *  *  *

"As for the rearrangement, relocation or replacement of the railroad and other utility facilities within the reservoir area, the cost for the purpose of determining the final amount of the Engineer's fee will be the actual cost to the City, i. e., the amount paid by it incident to such rearrangement, removal of or replacement of any such facility or facilities. To clarify this point, the following examples are stated:

"(a) If for example it is determined that a certain facility will remain in the reservoir area but that its owner will do certain construction or strengthening work of a cost of $50,000.00 of which the City agrees to pay $10,000.00, then $10,000.00 will be considered as the cost of this part of the work for the purpose of computing the Engineer's five per cent fee.

"(b) If an existing facility is to be removed and replaced by another facility crossing the reservoir area of a cost, *within the reservoir area itself,* of $200,000.00 of which the City agrees to pay $20,000.00 then $20,000.00 would be taken as the cost of this item for determining the amount of the Engineer's percentage fee.

"(c) If an existing facility is to be abandoned so far as it is within the reservoir area, then the Engineer will be entitled to no percentage at all upon any amount which the City may see fit to pay the owner of such facility as a part of its cost or damage on account of such abandonment, unless by replacement of the facility within the reservoir area itself the situation is brought within that described in (b) above.

"(d) Similarly, if an existing facility so far as it is within the reservoir area is to be abandoned by the owner of its salvages and removes part or all of the materials constituting the same (i. e., pipe, rails, bridge, etc.), then the Engineer shall be entitled to no percentage fee on account of this particular facility even though the City sees fit to agree to pay the owner thereof some sum of money in satisfaction of all or a part of its damages or less on account of such abandonment or salvage.

"(e) In the improbable event of the City itself undertaking within the reservoir area construction by way of replacing of or substitution for any of these existing facilities, then the Engineer's percentage fee shall be computed upon the entire cost of such work even though the City may be reimbursed for a part of such cost by the owners of some or all of the facilities so replaced.

"Although it is impossible at the moment to do much more than hazard a guess as to the cost to the City as hereinabove defined of the work to be done incident to the railroad and the other existing utilities within the reservoir area, the parties to this agreement presently estimate the probably total cost to the City of all of the work in connection with which the Engineer is hereby employed (that is, the reservoir clearing as well as the replacement, removal and/or rearrangement of facilities within the reservoir area) at the sum of $1,890,000.00, based upon which it is presently estimated that the Engineer's total fee will amount to the sum of $94,500.00.

" * * *

"VI.

"PAYMENTS. * * *

" * * *

"There is also attached a copy of a further letter from the Engineer addressed to such Director, dated January 3, 1951, discussing the applicability of certain of the provisions of numbered Paragraph V of this agreement to certain possible situations in such letter referred to. It is understood that the provisions of such letter shall be taken into full account in applying the provisions of such numbered Paragraph V hereof."

"HOWE & WISE
Consulting Engineers

January 3, 1951
"Mr. Frank N. Baldwin, Director
 Public Utilities
 City of Houston
 Houston, Texas
    Subject: Our Engineering Contract;
             San Jacinto River Reservoir

"Dear Mr. Baldwin.
"We have checked over the contract you submitted and believe that it is in line with our proposal.
"However, there is one point that we believe should be expanded to prevent a situation arising which might be governed by more than one interpretation of the meaning of the contract. We refer specifically to paragraphs (a), (b), (c), (d) and (e) under 'FEES' on page seven (7) of the contract. We can discuss these all together. We would like it to be clear that in cases of divided costs between the owner of a utility and the City of Houston in relocating, removing and replacing, abandoning, or other disposition of such utilities, that Howe &

Wise not be expected to furnish full engineering services for such relocation, or, etc., at a fee determined by a percentage of the City's cost only. In such cases we would expect the owner of such utilities to do the required engineering or pay Howe & Wise a fee comparable to that agreed to in this contract. Should the owner prefer to do the required engineering, then for the fee stated in paragraphs (a), (b), (c), and (e), Howe & Wise are to represent the City of Houston and make such inspections as are necessary to require the fulfillment of the agreement between owner and the City of Houston. Should Howe & Wise furnish the required engineering services, then Howe & Wise should receive the fee as stated herein and also a like fee from the owner on his part of the cost of such work. Such understanding should be in any agreement the City of Houston might make with the owner of said utility.

"Yours very truly,

HOWE & WISE

Original signed by W. F. Smith
By W. F. Smith

WFS/fl"

It was stipulated between the parties that:

" * * * the City of Houston paid Guy A. Thompson, Trustee, the Beaumont, Sourlake and Western Railway Company one million, five hundred and seventy-nine thousand, four hundred and seventy dollars in relocating and rebuilding their railroad line and bridge through the Lake Houston area in question in this case.

"It is further stipulated and agreed that the reasonable cost for the engineering services of Howe & Wise in supervising and checking and performing all the details called for in the contract in evidence in this case would have been the sum of two thousand dollars.

"It is further stipulated and agreed that all of the work to be performed by Howe & Wise under the contract in evidence in this case was fully and completely performed with the exception of the supervising and inspections and engineering work in connection with the relocating or rebuilding of the railroad line and bridge; and, that the Plaintiff, Howe & Wise, have been fully and completely compensated for all of the work performed by them under the contract or called for by the contract with the exception of the railroad line and bridge or other work in connection with the relocating of said railroad line and bridge."

The trial court entered a judgment in favor of appellees, Howe & Wise, in the sum of $76,973.50. This sum was arrived at by taking 5% of the amount paid to the Trustee for the Railway Company and deducting therefrom the stipulated reasonable cost of services called for in the contract in connection with the railroad bridge.

It is appellant's contention that under the facts of this case the statement that the City would not pay more than $50,000.00 to the Railway Company was the statement of an opinion, and known to be such by Smith, since he knew that the matter was being negotiated by the City's Legal Department with the Railway Company at the time and no final settlement had been reached or agreed to by the Railway Company and the City Council of Houston.

Appellant relies on the rule quoted in Patterson v. Bushong, Tex.Civ.App., 196 S.W. 962, as follows:

"It is said in 12 R.C.L. p. 244, that:

" 'As a general rule, in order to constitute actionable fraud, a false representation must relate to a matter of fact, and such fact must be one which exists in the present or which has existed in the past. It must also relate to a fact which is susceptible of knowledge; otherwise there is nothing in relation to which the persons making it could state what he knew to be untrue. Generally, therefore, fraud cannot be

predicated upon the mere expression of an opinion which is understood, to be only such or cannot reasonably be understood to be anything else, nor upon representations in regard to matters of estimate or judgment. The person to whom such statements are made has no right to rely upon them, and does so at his peril, nor can it be supposed that they influenced his judgment.' "

The testimony of Frank N. Baldwin developed that he was educated as a civil engineer and had also obtained a degree in architectural engineering. He had been employed by the City of Houston in 1938 or 1939 and became head of the Department of Utilities about 1946. As head of this department he reported only to the Mayor of the City. The Utilities Department was in charge of Lake Houston, or, more properly, the San Jacinto Water Project. He testified that if anyone wanted to know anything about the water department or the status of a water problem he would be the man to see rather than the Mayor or the City Council.

He testified that several engineering firms had contracts with the City and that because he wanted to see the firm of Howe & Wise get part of the work, he suggested to Mr. Smith that he submit a proposal. Mr. Baldwin had "some voice in recommending" what firms the City would contract, and he recommended that Howe & Wise be employed for the work finally set out in the contract forming the basis of this controversy. The reports of the engineers hired by the City to make an estimate of the damages that would be suffered by the Railroad by reason of the necessity of relocating their bridge were first sent to his department and, before the contract with Howe & Wise was entered into, the engineers had estimated the cost of removal of the bridge at $600,000.00. He knew that the Railroad had submitted estimates of the cost of removal, prior to the Howe & Wise contract, in the amount of $1,250,000.00 to $1,500,-000.00. His department handled the purchase of property needed for the reservoir,

but if an agreement for purchase could not be reached the negotiations were turned over to the legal department. When an agreement with the owner was reached on the purchase of property, his department "made recommendations to the Mayor and City Council and they would purchase it." Outside engineers employed by the City discussed their final estimates with him before such estimates were submitted. Prior to the time the waiver letter was written, Howe & Wise had been authorized by him to negotiate with two utility companies on a settlement of damages to be suffered by them in connection with the construction of the reservoir. In connection with such work, he had informed Howe & Wise that he would recommend that certain amounts be paid and his recommendations were followed by the City Council. In negotiating with the utilities damaged by the construction of the reservoir, Howe & Wise reported only to Baldwin, and when a final decision was reached by the City as to the amount of money it would pay as a compromise settlement of the damage claims, this decision was communicated to Howe & Wise by Baldwin. Mr. Baldwin testified that he was in a better position to know what the City was going to do about the railroad bridge than was Mr. Smith.

In October, 1951, Howe & Wise submitted a bill to the City for certain work which they had undertaken at the request of Mr. Baldwin. Since this work was done outside the reservoir area, a legal question arose concerning the construction of the Howe & Wise contract and the question was submitted to the legal department. While the matter was being considered other bills were submitted and were not paid. The firm of Howe & Wise was in very serious financial difficulty. By the First of November the total amount of estimates presented for payment had amounted to $7,600.00. Mr. Baldwin then learned from the legal department that they hesitated to approve payments to Howe & Wise for work concerning properties outside the reservoir area because it might set a precedent for a claim

on the part of Howe & Wise that its contract covered work on that part of the railroad bridge located outside the reservoir area. It was suggested that the difficulty might be removed by securing a waiver from Howe & Wise of their right to compensation for such work.

On the 23rd day of November, Mr. Baldwin called Mr. Smith and told him that he thought his bills would be approved if he would waive compensation for the railroad bridge. Mr. Smith testified that Mr. Baldwin told him at that time that in no event would the City pay the Railroad more than $50,000.00. Mr. Baldwin denied making that statement and testified that there was no discussion of what the City would pay. However, Smith testified that he believed Baldwin's representation and because of it told him that he would waive compensation due by reason of payments made by the City to the Railroad on condition that he would not be responsible for any work concerned with the bridge. A letter to this effect was written at Baldwin's suggestion and on December 20, 1951, the bills were paid.

Mr. Smith testified that because of the statement made by Mr. Baldwin he thought that the City would make only a token payment to the Railroad. On such a basis the compensation due him under his contract would amount to $2,500.00 or less. It was stipulated that the reasonable cost of the engineering services of Howe & Wise in supervising and checking and performing all of the details called for in the contract referable to the railroad bridge would have been the sum of $2,000.00. While Smith testified that he had made his own estimate of the expense of relocating the railroad bridge and knew that the cost would be very substantial, he also knew that it was possible that the bridge might be relocated outside the reservoir area, in which event he would be entitled to no fee based on the bridge work, and that $2,500.00 was a small part of the contract.

He testified that he had complete confidence in Mr. Baldwin and justified his un-questioning acceptance of the statement made by Mr. Baldwin on the basis of the close association which had existed between them for many years. He related that he had gone to work under him for a federal agency several years earlier; that he had later been promoted to the position of Area Engineer on the recommendation of Mr. Baldwin; that he had frequently sought his advice on problems arising in his work with the County; that he had sought the contract in question on Mr. Baldwin's advice and had secured it on his recommendation; that he had lunch with Mr. Baldwin and saw him socially and on business several times each week. An impartial and fairminded jury might well have concluded that, in view of the past relationship shown to have existed between Smith and Baldwin, and in view of the position which Baldwin held and the sources of information available to him, Smith relied on the representation made by Baldwin and in so doing acted as a reasonable man would have done under the circumstances.

Appellant points out that, in our opinion on the previous appeal, we held that the waiver was voluntary and intentional. This statement was made in rejecting the cause of action asserted by appellee to set aside the waiver on the ground that it was induced by economic compulsion. The word "voluntary" as used there conveyed the holding of the Court that as a matter of law the waiver was not induced by economic compulsion.

It is also pointed out that on the previous appeal we held that the overwhelming weight and preponderance of the evidence showed that Smith did not rely on Baldwin's representation, and, further, that by reason of facts shown by Smith's testimony to be known to him, he had no right to rely on a statement which he knew was only an opinion. It is argued that the evidence on this appeal is substantially the same and that we are bound to reach the same conclusion under the doctrine of the Law of the Case. The evidence at this trial is sub-

stantially different insofar as it bears on the question of reliance in fact. Evidence produced at the former trial indicated that the waiver was signed primarily because of economic necessity. On objection of appellant, much of this evidence was excluded on this trial. More detailed evidence was produced showing the relationship between Smith and Baldwin and the customary procedures followed by the City in reaching agreements to pay compensation to those damaged by the construction of the reservoir. There is evidence of probative force to support the answer made by the jury on the reliance issue and there is nothing to indicate that the jury was influenced by any improper motive in reaching its answer. The conclusion of the court to the contrary on the previous appeal might have been supported by the circumstance that the jury, after finding that Smith relied on the statement by Baldwin, also found that he signed the waiver letter *only* because Baldwin had led Smith to believe that unless he did he would not be paid for previous services.

■ Without further recitation of the testimony, we have determined, after a careful study of all the evidence, both that opposed to, as well as that supporting, the verdict of the jury, that none of the answers made by the jury to issues submitted to them, are so contrary to the weight and preponderance of the evidence as to be clearly wrong, and that all of the answers are supported by evidence of probative force.

■ Appellees' testimony, considered in its entirety, cannot be taken as a judicial admission that the representation made by Baldwin was merely an opinion. Rather it shows that, while Smith realized that the statement should be characterized as an opinion since it obviously referred to an action to be taken in the future, he understood either that Baldwin knew the state of negotiations, and knew that there was a reasonable probability that the railroad would accept an offer of $50,000.00 or less, and that there was little doubt but that the City

Council would follow the recommendation of the legal department and pay such an amount, or else that Baldwin honestly entertained an opinion, based on facts known to him, that the City would in no event pay more than the stated sum. Neither supposition amounts to what the courts have characterized a *mere* opinion, a conclusion drawn from known facts, or facts available to both parties, or sheer speculation.

■ Having determined, after a review of all the evidence, that the answers made by the jury to the special issues are not clearly wrong and unjust, we are now required to determine whether under the issues as answered by the jury a proper judgment was rendered. In view of the answers made by the jury to the special issues, we find that appellees were induced to enter into the contract waiving the profit to accrue to them from the relocation of the bridge by reason of the representation made by Baldwin, a representation that Baldwin knew was false, but nevertheless made for the purpose of inducing Smith to enter into the contract. Smith relied on this representation and would not have entered into the contract of waiver had the representation not been made. As a result of this course of conduct, designed to deceive appellee, he was deceived and as a result suffered a severe financial loss. Appellant, under the verdict of the jury, has been unjustly enriched and equity seeks to prevent unjust enrichment.

■ A statement of the rule which we think applicable in this case is found in an annotation in Volume 51 A.L.R. 46, at page 63, reading:

"If one makes a statement regarding an event to take place in the future, obviously the statement should ordinarily be regarded merely as an expression of opinion, and the courts will frequently stop at this point and hold that such a statement cannot serve as a basis on which to predicate fraud. But if there are circumstances tending to

show an actual fraudulent intent at the time the promise or representation regarding a future event is made, then the situation is entirely changed. According to the weight of authority, if the person making the promise or statement as to a future event is guilty of an actual fraudulent intent, and makes the promise or misrepresentation with the intention of deceiving and defrauding the other party, and accomplishes this result, to the latter's injury, fraud may, under many circumstances, be predicated thereon, notwithstanding the future nature of the representations. This result is reached frequently on the theory that a person's intention or belief is a matter of fact, and that, therefore, if a misrepresentation is made with regard to the same, the misrepresentation is one of fact. But the particular circumstances determine largely the result in this class of cases. This seems to be true, partly, at least, for the reason that the questions whether a representation should be regarded as a mere expression of opinion, and whether one to whom it is made ordinarily does and has a right to rely thereon, depend on the nature of the representation and the relation of the parties."

This statement of the law finds support in many Texas cases and in the Restatement of the Law of Contracts, § 474. Buchanan v. Burnett, 102 Tex. 492, 119 S.W. 1141; Mitchell v. Zimmerman, 4 Tex. 75; Henderson v. Railroad Company, 17 Tex. 560; Edward Thompson Co. v. Sawyers, 111 Tex. 374, 234 S.W. 873; Chicago, T. & M. C. Ry. Co. v. Titterington, 84 Tex. 218, 19 S. W. 472; Buchanan v. Burnett, 102 Tex. 492, 119 S.W. 1141; Ramey v. Allison, 64 Tex. 697; Safety Casualty Co. v. McGee, 133 Tex. 233, 127 S.W.2d 176, 121 A.L.R. 1263; opinion adopted; Spradlin v. I. & L. Development Co., Tex.Civ.App., 253 S.W.2d 92, err. ref., n. r. e.; Price v. D'Yarmett, Tex.Civ.App., 27 S.W.2d 616, writ ref.; Russell v. Industrial Transportation Co.,

113 Tex. 441, 251 S.W. 1034, 51 A.L.R. 1; Tips v. Barneburg, Tex.Civ.App., 11 S.W. 2d 187; Riggins v. Trickey, 46 Tex.Civ. App. 569, 102 S.W. 918; Houston v. Darnell Lumber Co., Tex.Civ.App., 146 S.W. 1061, writ den.

■ ■ Appellant insists that appellee had a duty to use reasonable diligence to determine the truth or falsity of the representation, and that an inquiry to the City legal department or to the railroad company would have revealed that neither party expected that the claim of the Railroad would be settled for the amount represented. In the case of Thigpen v. Locke, Tex. Sup., 363 S.W.2d 247, the court held:

"As to the contention that there was some evidence on the second theory of actual fraud, petitioner has interposed the rule that a party to an arms-length transaction is charged with the obligation of reading what he signs and, failing that, may not thereafter, without a showing of trickery or artifice, avoid the instrument on the ground that he did not know what he was signing. Indemnity Insurance Company of North America v. W. L. Macatee & Sons, 129 Tex. 166, 101 S.W.2d 553. This rule is but a narrower application of the principle that the party claiming fraud has a duty to use reasonable diligence in protecting his own affairs. 'In an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests and is charged with knowledge of all facts which would have been discovered by a reasonably prudent person similarly situated. And a failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party.' Courseview, Inc. v. Phillips Petroleum Co., 158 Tex. 397, 312 S.W.2d 197."

This rule was established in Texas as early as Womack v. Western Union Telegraph Co., 58 Tex. 176, and Morrison v.

Insurance Company of North America, 69 Tex. 353, 6 S.W. 605. In the Indemnity Insurance Company case the court recognized an exception where the signature was obtained by a false representation, trick or artifice. While it may be that the Supreme Court in Thigpen v. Locke, supra, has eliminated "false representation" from this exception, the case quoted from, Courseview, Inc. v. Phillips Petroleum Company, 158 Tex. 397, 312 S.W.2d 197, merely reaffirmed a similarly well established rule to the effect that where a cause of action is based on fraud, the statutes of limitation do not begin to run until the fraud is discovered, or by the exercise of reasonable diligence might have been discovered. Smith v. Fly, 24 Tex. 345, Kuhlman v. Baker, 50 Tex. 630; Bass v. James, 83 Tex. 110, 18 S.W. 336; Sherman v. Sipper, 137 Tex. 85, 152 S.W.2d 319, 137 A.L.R. 263.

■ However, where a contract is induced by acts of positive fraud, a different rule has been applied. This rule seems to have been adopted in Texas for the first time by the Supreme Court in Labbe v. Corbett, 69 Tex. 503, 6 S.W. 808, and was clearly stated by Justice Speer in Western Cottage Piano & Organ Co. v. Anderson, 45 Tex.Civ.App. 513, 101 S.W. 1061, as follows:

"It is not the rule that a person injured by the fraudulent and false representations of another is held to the exercise of diligence to suspect and discover the falsity of such statements. In the absence of knowledge to the contrary, he would have a right to rely and act upon such statements, and certainly the wrongdoer in such a case cannot be heard to complain that the other should have disbelieved his solemn statements."

■ This statement of the rule is well supported by authority. Buchanan v. Burnett, 102 Tex. 492, 119 S.W. 1141; Moore v. Beakley, Tex.Com.App., 215 S.W. 957;

Graves v. Haynes, Tex.Com.App., 231 S.W. 383; Wortman v. Young, Tex.Com.App., 235 S.W. 559; Guaranty Bond State Bank v. Kelley, Tex.Com.App., 13 S.W.2d 69; Crofford v. Bowden, Tex.Civ.App., 311 S.W.2d 954, writ ref.; Smith v. Bifano, Tex.Civ.App., 330 S.W.2d 473, writ ref., n. r. e.; Wren v. Bohannon, Tex.Civ.App, 256 S.W.2d 112; Schonrock v. Taylor, Tex. Civ.App., 212 S.W.2d 260, writ ref. It is unlikely that by the statement in Thigpen v. Locke, supra, the Supreme Court of Texas intended to change this well established rule of law and we are unable to say that appellee had knowledge of facts demonstrating the falsity of the representation which the jury found Baldwin made to him. Under the circumstances of this case, there was no duty on appellee to investigate for the purpose of learning the truth of the representation.

■ Appellant urges that appellees are not entitled to a judgment, even if the waiver is set aside, because under the contract they were not required to do any work, or entitled to compensation based on payments to the railroad company, if the railroad company did its own engineering in the relocation and reconstruction of the bridge. Appellant also points out that there is no evidence in the record that the City requested appellees to perform engineering services in connection with the bridge or that appellees offered to perform such services. They state that the record shows that the Railroad did its own engineering.

The record discloses that the railroad bridge was replaced by another bridge within the reservoir area. The record does not show that all engineering services required in the construction of the bridge were furnished by the Railroad. The heading of paragraph B of the contract between the City and Howe & Wise indicates that the work to be done by the engineers would be of a supervisory nature. This view is reinforced by the wording of the entire paragraph. The fact that the railroad engineers designed the bridge and supervised its

construction, if such be assumed, would not necessarily rule out the necessity of supervision by the City for the purpose of requiring that the work be done in such a manner as to involve a minimum of danger to the reservoir. It may be determined from a construction of paragraph B that in ordinary prudence the City would have found it necessary to perform such service for itself had there been no agreement with Howe & Wise. An inference may be drawn from the stipulation of the parties that some engineering services of a reasonable cost of $2,000.00 were required for necessary supervision of the construction of the bridge.

Paragraph V of the contract provided that a fee be paid Howe & Wise for all services to be rendered by them, calculated by taking 5% of the actual cost to the City of certain payments made by the City. There is no provision making that portion of this total fee determined by the cost of relocating the railroad contingent on the supervision of such work by them. Only if the bridge had been abandoned, or removed, and not reconstructed within the reservoir area, did the contract provide that Howe & Wise would receive no percentage of the money which the City paid the Railroad for all or part of its damage. It was stipulated that appellees fully performed the contract "with the exception of the supervising and inspections and engineering work in connection with the relocating or rebuilding of the railroad line and bridge." Smith testified that the reason he failed to fully perform was the waiver agreement. Since this agreement was induced by the fraud of an agent of the City, the City has prevented performance and the failure to perform is excused. Sanderson v. Sanderson, 130 Tex. 264, 109 S.W.2d 744, opinion adopted. At the previous trial of this case, appellees recovered a judgment against appellant for other sums due them under this contract, and on appeal this judgment was

affirmed except as to this item. Necessarily it was determined that the contract was substantially performed by appellees and that they were entitled to recover the money due them by the terms of the contract. The question remanded for trial was whether the cost of relocating the railroad should be considered in determining appellees' compensation in view of the waiver contract. 4 Tex.Jur.2d, Appeal and Error, § 1007 et. seq.

Appellant's contention that the trial court erred in permitting appellees to examine F. N. Baldwin under the adverse witness rule cannot be sustained. Before calling their first witness, appellees invoked the rule. Appellant designated Mr. Baldwin the representative of the City and requested that he be excused from the rule. This request was granted by the court by reason of his having been so designated. At the time the events transpired on which this suit is based, Mr. Baldwin was employed by the City in an executive position, and the foundation of the suit is his alleged wrongful conduct. When he was called as a witness by appellees, he was in fact a hostile and adverse witness. City of Waco v. Criswell, Tex.Civ.App., 141 S.W.2d 1046; City of Houston v. Glover, Tex.Civ.App., 355 S.W.2d 757, writ ref., n. r. e.

Appellant asserts that the trial court erred in admitting into evidence the bills submitted to the City by Howe & Wise which had not been paid at the time the waiver letter was executed. Prior to the offer of these bills testimony concerning the amount of money due Howe & Wise was volunteered by F. N. Baldwin and received without objection. The evidence was relevant on the issue of reliance, and properly was admitted into evidence.

The judgment of the trial court is affirmed.