J. W. THIGPEN, Petitioner,

v.

Robert C. LOCKE et ux., Respondents.

No. A-8908.

Supreme Court of Texas.

Dec. 5, 1962.

Rehearing Denied Jan. 16, 1963.

248

Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, for petitioner.

Dougal C. Pope, Houston, for respondents.

HAMILTON, Justice.

This is a suit to set aside two deeds executed by Mr. and Mrs. Robert C. Locke (plaintiffs) by which they conveyed title to a Houston lot and grocery store to J. W. Thigpen (defendant). The trial court instructed verdict for Thigpen, and the Court

of Civil Appeals has reversed and remanded. 353 S.W.2d 249. Thigpen is petitioner here

Respondents' theory is that the first deed is void because intended as a mortgage on business homestead property. Since petitioner does not rely on this deed, it need not be considered.

■ As to the second deed, dated January 2, 1951, respondents also pleaded homestead protection, but this apparently has been waived as it was not argued in the briefs. The other basis of respondents' prayer for cancellation of the second deed is equitable in nature, asserting three separate grounds for the imposition of a constructive trust.

On January 2, 1951, the Lockes executed three instruments: (a) a warranty deed conveying fee simple title to the lot and store to Thigpen; (b) a five-year lease of the premises back to the Lockes; and (c) a bill of sale to Thigpen covering all the fixtures in the grocery store. All of these instruments are acknowledged and otherwise formally in order.

Respondents' version of the facts is as follows:

Since 1947 the Lockes had been in the grocery business, having paid about $2,700 for their lot and building. In 1947 the Lockes met Thigpen, the "trust officer" of a local bank. According to Locke's testimony, Thigpen helped them to get a loan and after that they became close friends. They saw each other frequently, and Thigpen bought meat from the Lockes' grocery store. Thigpen helped them to get other loans and personally guaranteed one of them.

In 1949 Thigpen himself loaned respondents $5,000 and took a deed (the first deed) to the lot and grocery store as a mortgage. During 1949 Thigpen suggested that the Lockes form a corporation for the purpose of operating the grocery business, and the Lockes agreed. Respondents did not hire their own attorney but left the details of

incorporation entirely up to Thigpen, who selected an attorney, signed as incorporator, and advanced $1,000 as capital stock, which was repaid. The lot and store were never conveyed to the corporation, but the Lockes endorsed all their shares of stock back to Thigpen as security for the $5,000 debt.

After the corporation was formed Thigpen's son, and later Thigpen himself, kept the books for the business. Thigpen was a director, vice president, and owner of two shares; Mr. Locke was president and, with his wife, owner of the 58 other shares. Locke testified that Thigpen often acted as business advisor to him in the management of the grocery business.

After the incorporation Thigpen continued to loan the respondents or the corporation money until their indebtedness reached almost $10,000. At this point—around November or December, 1950—Locke spoke to Thigpen about taking bankruptcy, but Thigpen urged him not to do so because he (Thigpen) would lose all of his investment. Locke testified that he then told Thigpen: "I want to pay everybody, I don't want to lose my property, and if you and I can work out something so you can get your money, I will be glad to do it." On January 2, 1951, Thigpen presented the instruments in question to respondents for their signatures. The Lockes testified that they did not read the instruments before signing.

According to Locke, he understood their transaction was that respondents would lease the property to Thigpen. Thigpen would sublet to the corporation, collect the rent, pay the expenses on the property, and apply whatever was left over from the rent payments to the indebtedness of the Lockes until the $10,000 was paid off. Respondents testified that Thigpen told them that it would be paid off in five or six years, after which time they could reclaim their property.

The instruments reflect an absolute sale of the land and fixtures and a lease back to the Lockes under which they were to pay rent for the continued use of the property as

a grocery business. Thigpen assumed a vendor's lien of about $3,500 on the property.

The only evidence other than Locke's testimony that respondents thought they were signing a lease as lessors rather than a deed is found on the face of the printed lease agreement: the Lockes signed that instrument on the line marked "Lessor". The body of the lease agreement identifies Thigpen as lessor and respondents as lessees.

Immediately after signing the papers on January 2, 1951, the Lockes moved to another town and began selling chickens, leaving Locke's brother in charge of the store.

A few months after the execution of the deed, lease, and bill of sale the Lockes executed another instrument which Mr. Locke did not remember reading; this was a bill of sale on the grocery store stock transferred to Thigpen in satisfaction of arrearage in rent payments to Thigpen under the lease of January 2, 1951. This bill of sale describes the property and expressly refers back to the deed and lease of January 2, 1951.

The Court of Civil Appeals has held that it was error for the trial court to instruct verdict because (a) whether or not there was a confidential relationship is a jury question; (b) there was some evidence from which a jury could infer that there was a confidential relationship; and (c) respondents' suit was not as a matter of law barred by the statute of limitations, but that there was a fact issue raised as to the reasonableness of respondents' five or six years' delay in attempting to get back their property. Petitioner Thigpen's application for writ of error was granted on points of error complaining of these three holdings.

As stated above, respondents have pleaded and argued on appeal three separate grounds for the imposition of a constructive trust; (I) Thigpen was guilty of actual fraud; (II) this was not an absolute conveyance but a mortgage transaction; and (III) there was a relationship of trust and confidence and breach of fiduciary duties constituting constructive fraud and giving rise to a constructive trust.

## I.

Under the first ground respondents seek to invoke the rule that equity will impose a constructive trust to prevent one who obtains property by fraudulent means from being unjustly enriched. Scott on Trusts, Vol. I, § 44.1, p. 251. The respondents' pleadings allege, and their reply brief argues, two inconsistent factual theories of actual fraud: (A) that this was an agreement whereby respondents voluntarily *deeded* the property to Thigpen in return for his oral promise to reconvey when the $10,-000 debt had been paid off, which promise Thigpen did not intend to honor at the time he made it; and (B) that Thigpen led respondents to believe that the instrument was not a deed but a *lease* and that they signed believing it to be a lease.

The first theory of fraud alleged is based on the rule of Turner v. Biscoe, 141 Tex. 197, 171 S.W.2d 118, that when a grantor voluntarily conveys land to a grantee upon the false oral promise that the grantee will reconvey, such is actual fraud justifying the imposition of constructive trust. The requisite fraudulent misrepresentation is as to the grantee's state of mind. Respondents contend that they have met their burden of offering some evidence on both elements of this theory of fraud and that it was therefore error for the trial court to sustain the instructed verdict against them. We do not agree that there is any evidence in the record of the first theory of actual fraud. Instead, we think that on the trial respondents elected between the two theories and offered testimony only on the theory that they did not know what they were signing. The rule of Turner v. Biscoe, supra, is based upon the premise that the grantor consciously deeded his land away on the strength of an oral promise by grantee that he would reconvey, not that he thought he was granting a leasehold.

Mr. Locke's testimony as to what they understood the agreement to be is as follows:

"Q. Would you mind stating in your own words just what that agreement was?

"A. The corporation was going to continue to operate the store; the corporation was going to give Mr. Thigpen the right to collect the rent off of my property and apply such rent that was collected against the indebtedness I owed him or the Bank of the Southwest, whichever it was, and that is what I thought I was executing when I executed * * * —

* * * * * *

"Q. Now in that connection, what line does your own signature appear on?

"A. [Locke looking at the instrument] Lessor.

* * * * * *

"Q. In connection with your conversation with Mr. Thigpen about him, that he was going to collect the money, collect the rent off of this property and use the money to pay expenses, pay the loan on the property, the expenses on the property and what was left pay himself, pay the rest of it to himself, was anything ever said about how long he thought it would take before he would get his money back?

"A. Between five and six years, that was the reason for the five-year lease.

* * * * * *

"Q. As a result of the conversation you had with Mr. Thigpen, in other words, at the time you had it before these papers were signed in January of 1951, would you mind stating whether or not it was your understanding that you and Mrs. Locke would lease this property to Mr. Thigpen?

"A. Right, sir."

This testimony taken most favorably to the respondents does not give rise to the inference that they consciously deeded the property on any oral promise to reconvey. The question of whether or not there was some evidence of fraud under Turner v. Biscoe must be answered in the negative.

■ As to the contention that there was some evidence on the second theory of actual fraud, petitioner has interposed the rule that a party to an arms-length transaction is charged with the obligation of reading what he signs and, failing that, may not thereafter, without a showing of trickery or artifice, avoid the instrument on the ground that he did not know what he was signing. Indemnity Insurance Company of North America v. W. L. Macatee & Sons, 129 Tex. 166, 101 S.W.2d 553. This rule is but a narrower application of the principle that the party claiming fraud has a duty to use reasonable diligence in protecting his own affairs. "In an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests and is charged with knowledge of all facts which would have been discovered by a reasonably prudent person similarly situated. And a failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." Courseview, Inc. v. Phillips Petroleum Co., 158 Tex. 397, 312 S.W.2d 197.

There is no evidence of active trickery or deceit in this record. But respondents contend that they were relieved of the duty to read the instruments because of the relationship of trust and confidence, that, on the contrary, Thigpen as a fiduciary owed them the duty of fully disclosing to them what it

was they were signing, and that failure to disclose is sufficient deception to take the case out of the rule in Indemnity Insurance Company of North America v. Macatee, supra. In the interest of clarity we lay that question aside until we reach our discussion of the points of error dealing with confidential relationship.

## II.

The second main ground upon which respondents base their claim of entitlement to a constructive trust is that this was intended as a security transaction and not an absolute conveyance. The doctrine which respondents seek to invoke here arises from the equitable rule that parol agreements may be proved to show that what appears to be an absolute conveyance is actually a mortgage, irrespective of fraud. Bradshaw v. McDonald, 147 Tex. 455, 216 S.W.2d 972; Wilbanks v. Wilbanks, 160 Tex. 317, 330 S.W.2d 607; 4 Pomeroy Equity Jurisprudence, (5th ed., 1941) § 1196, p. 581. This rule covers the case in which a grantor voluntarily conveys property to a grantee who orally promises to reconvey, presumably intending at the time to keep his promise but who subsequently refuses or fails to perform.

It is true that some courts give the grantor relief in these security arrangements by way of the constructive trust device, reasoning that the breach of the oral agreement is evidence which may be considered in determining whether or not there was fraud in the original agreement, but the usual view is that mere breach of contract is not fraud and that it may not be evidence of fraud. The constructive trust, according to the latter view, requires actual or constructive fraud or other inequitable behavior at the time the original transaction is entered into. 54 Am.Jur., Trusts, § 231, p. 177.

It is well settled in Texas that an absolute deed may be shown by parol evidence to be a mortgage, Bradshaw v. McDonald, supra; Wilbanks v. Wilbanks, supra, but the Texas courts generally have not based re-lief on the constructive trust device. This court has held that mere breach of an oral contract is not fraud and that subsequent breach is not evidence that may be considered in determining whether or not there was fraud in the original transaction. Turner v. Biscoe, supra. This court has also held that actual or constructive fraud is essential to a constructive trust. Talley v. Howsley, 142 Tex. 81, 176 S.W.2d 158. There are, however, cases to the contrary. Faville v. Robinson, 111 Tex. 48, 227 S.W. 938.

But whatever the state of the Texas decisions in this area, they do not apply to respondents' case; for, as we have pointed out above in our discussion of the fraud ground, there is no testimony by the Lockes tending to show that they consciously deeded their property to Thigpen; their testimony consistently is that they believed they were leasing it to him.

## III.

We have eliminated respondents' first two grounds; if they are entitled to a constructive trust, it must be on the ground that they had entered into a relationship of trust and confidence with Thigpen. Respondents' theory is that Thigpen breached his fiduciary duty by failing to fully disclose to them that they were signing a deed rather than a lease. If there is a confidential relationship, respondents would be relieved of the duty of reading the instruments and could justifiably rely on their fiduciary, Thigpen, to treat them with the utmost fairness. The effect of establishing the relationship of trust and confidence would be to remove from the case the rule of Indemnity Insurance Company of North America v. Macatee.

Petitioners' points of error complain that the Court of Civil Appeals erred in holding that the existence of confidential relationship is a fact question for the jury, erred in holding that there was some evidence to go to the jury, and erred in holding that limitations had not as a matter of law run against respondents' cause.

Restatement of Restitution defines the confidential relationship as existing " * * * where, because of family relationship or otherwise, the transferor is in fact accustomed to be guided by the judgment or advice of the transferee or is justified in placing confidence in the belief that the transferee will act in the interest of the transferor." Restatement of Restitution, § 182, Comment on clause (b), p. 735.

■ In the cases of Mills v. Gray, 147 Tex. 33, 210 S.W.2d 985, and Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256, this court recognized that confidential relationships may arise not only from the technical fiduciary relationships such as attorney-client, trustee-cestui que trust, partner and partner, etc.—which as a matter of law are relationships of trust and confidence—but may arise informally from "moral, social, domestic or purely personal" relationships. 54 Am.Jur. 173, § 225, "Trusts". (Quoted in Fitz-Gerald v. Hull, supra.) The existence of the fiduciary relationship is to be determined from the actualities of the relationship between the persons involved.

■ Taking the testimony as a whole and most favorably to the respondents, we hold that in this case there is not such evidence of justifiable trust and confidence as will create a fiduciary relationship. We may assume that respondents did trust Mr. Thigpen; they have testified so time and time again, but mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship so as to avoid the statute of frauds. Businessmen generally do trust one another, and their dealings are frequently characterized by cordiality of the kind testified to here. If we should permit respondents to set aside their conveyances on such slender evidence, the security of contracts and conveyances in this state would be seriously jeopardized.

In Pope v. Garrett, 147 Tex. 18, 211 S.W.2d 559, 562, Judge Smedley said:

"* * * We realize that a constructive trust does not arise on every

moral wrong and that it cannot correct every injustice. [Citation omitted.] It must be used with caution, especially where as here proof of the wrongful act rests in parol, in order that it may not defeat the purposes of the statute of wills, the statute of descent and distribution, or the statute of frauds."

Our holding in no way detracts from the principle that a relationship of trust and confidence may be shown to arise informally from purely personal relationships. All we hold is that respondents do not testify to facts—other than their own subjective feelings—which show that their relationship with Thigpen was anything more than a debtor-creditor relationship.

■ We reaffirm the principle that parties to a contract have an obligation to protect themselves by reading what they sign. Unless there is some basis for finding fraud, either actual or constructive, they may not excuse themselves from the consequences of failing to meet that obligation because they unwisely trusted the other party. Indemnity Insurance Company of North America v. Macatee, supra; Courseview, Inc., v. Phillips Petroleum Co., supra.

In view of our holding in this case it is not necessary for us to reach petitioner's point of error dealing with the statute of limitations.

The judgment of the Court of Civil Appeals is reversed, and the judgment of the trial court is affirmed.

CALVERT, C. J., and WALKER and STEAKLEY, JJ., dissenting.

CALVERT, Chief Justice (dissenting).

Our decision in MacDonald v. Follett, 142 Tex. 616, 180 S.W.2d 334, holds, on an issue squarely presented, that a business relationship not meeting the legal standards of a partnership or joint venture or any other legal relationship giving it a

technical fiducial character may yet be such a confidential relationship as to impose fiducial duties and obligations upon the parties to it. In that case we deliberately disavowed any holding that MacDonald and Follett were either tenants in common or cotenants in certain oil royalty interests and predicated our decision on a holding that they were nothing more than joint owners, a relationship which we recognized does not in and of itself constitute a technical fiducial relationship. We nevertheless held that evidence of dealings between the parties raised a fact issue as to whether there was such a confidential relationship as to impose fiducial duties and obligations on one to the other and to form the basis for imposition of a constructive trust. We said:

> " * * * Whether or not joint owners of overriding royalty interests sustain relations of trust and confidence toward each other depends upon the facts and surrounding circumstances. * * *
>
> "This is a suit in equity and in that realm the conduct of parties is judged by refined standards. No rules can be prescribed and no attempt should be made to formulate rules for the measurement of conduct by courts of equity, but that such conduct must be measured by standards exacting the utmost fidelity between the parties is universally recognized."

In Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256, 261, we quoted with approval from 54 Am.Jur. 173, Trusts, § 225, and thus recognized that a constructive trust may be predicated upon an .abuse of confidence which springs from "either a technical fiduciary relationship or of an informal relationship where one person trusts in and relies upon another, whether the relation is a moral, social, domestic, or merely personal one."

Our late decisions seem thus to commit us to the conclusion that a relationship of trust and confidence predicating the imposition of a constructive trust can grow out of business associations. There is not the slightest indication in our decisions, or in any other coming to my attention, that a business association of debtor and creditor is an exception to the rule.

One other holding in MacDonald v. Follett is important to the proper disposition of this case. With the issue squarely drawn before us, we held that whether facts existed which would create a confidential relationship was for the jury or trier of the facts to decide. In the later case of Schiller v. Elick, 150 Tex. 363, 240 S.W.2d 997, 999, we held that whether a confidential relationship existed as a predicate for imposition of a constructive trust was "a question of fact." It could hardly be otherwise once we recognize that confidential relationships are not confined to legal relationships but may grow out of informal social and business relations. As in most fields of the law, we will have cases in which we can say that the evidence establishes conclusively that there was or was not a confidential relationship, but there will be others in which the evidence will leave the ultimate inference to be drawn in that grey zone in which the trier of facts has always functioned in our system of jurisprudence. Our difficulties begin, of course, when we are called upon to determine whether the evidence in a particular case creates a grey zone.

In this case the trial judge concluded that the evidence did not raise a question of fact as to the existence of a confidential relationship between the parties and instructed a verdict for Thigpen. In determining whether that action was erroneous we must follow the familiar rule of considering only the evidence and the inferences arising therefrom which tend to establish a confidential relationship. Unfortunately, when we have completed that task we are still without an easy answer to the problem because we have no precise rule to measure the probative force of the evidence and the inferences we have considered. One of the best statements of a rule of measurement which I have found is in

Collins v. Nelson, 193 Wash. 334, 75 P.2d 570, 574, as follows:

"To establish a fiduciary relationship upon the violation of which fraud is sought to be based, there must be something more than mere friendly relations or confidence in another's honesty and integrity. There must be something in the particular circumstances which approximates a business agency, a professional relationship, or a family tie, something which itself impels or induces the trusting party to relax the care and vigilance which he otherwise should, and ordinarily would, exercise."

The majority opinion sets out in paragraphs 5, 6, 7, 8 and 9 most of the evidence which it is claimed authorizes a finding of a confidential relationship. That and such other evidence as seems relevant, together with what I regard as reasonable inferences therefrom, will be included in my summary.

In mid-1947 Locke needed money. He and Thigpen were brought together by a mutual friend. Thigpen aided Locke in obtaining the needed loan. From that incident a casual personal and business relationship developed, with Thigpen making some of his purchases at Locke's store. In July 1949 Thigpen learned that Locke needed $5,000.00 and that to obtain a loan in that amount was willing to execute a note for $6,000.00. Thigpen made the loan of $5,000.00 and took Locke's note for $6,000.00. Thigpen had Locke execute a deed conveying to him the real property in which the grocery business was located. Thigpen's testimony shows that this deed was intended by him to be nothing more than a mortgage. Locke's testimony is that he did not read the instruments executed on that occasion and did not know he had executed the deed until his deposition was taken in connection with this suit.

If the dealings between the parties had terminated at that point and Locke's legal rights turned on the existence of a confiden-tial relationship as excusing his failure to read the instruments he signed, I would conclude that the evidence fails as a matter of law to raise a fact issue as to its existence. But their dealings did not end at that point; and the two-years' friendship and 1949 loan may be considered as a part of the whole picture which existed in January 1951 when the second deed was executed.

A jury could find that from the date of the 1949 deed, Thigpen practically took over the direction of the financial affairs of the grocery business. The business dealings between the parties became informal and lax. Locke did not make some of the promised regular payments on his note but Thigpen took no action to force prompt payment. Thigpen made advances to and payments on Locks's behalf without at the time requiring any written promise to repay, being content to assimilate the advances into a written obligation at some later date. In January 1950 Thigpen guaranteed a line of credit of $1,000.00 for Locke without requiring security. Locke began to rely on Thigpen as his business adviser. He took Thigpen with him to a conference with another grocer when he was considering joining a chain arrangement. Thigpen advised against it and Locke abandoned the idea. Thigpen advised incorporation of the grocery business. Locke accepted the advice. Thigpen arranged for the preparation of the articles of incorporation and paid in the $1,000.00 capital, taking the risk of obtaining reimbursement from profits of the business. He took two shares of the stock himself and became vice-president and a director of the corporation. He was not satisfied with Locke's bookkeeping system, or lack of one, and had a system installed. Thigpen and his son kept the books. According to Thigpen's testimony the corporation never really functioned. The business did not prosper.

Such was the state of the business dealings of the parties in November or December 1960. To all intents and purposes the parties were jointly interested in and joint-

ly operating the grocery business; perhaps not as a technical partnership but most certainly as some type of joint undertaking. A jury could conclude that of the two Thigpen had become the dominant and Locke the servient figure in the business. The record does not record a whisper of dissension or ill-feeling between the two. Locke's debts were worrying him. He considered bankruptcy and mentioned it to Thigpen. He said he wanted to pay his debts and didn't want Thigpen to lose his money. Thigpen advised against bankruptcy. Locke abandoned the idea when Thigpen suggested a way out: If Locke would lease the real property (to which Thigpen already had a deed) to him, Thigpen would pay all of Locke's debts totalling some $9,900.00, lease the business back to him for $75.00 per week, pay all taxes, insurance, etc., and apply the balance of the rentals to the indebtedness until fully paid, which would take five or six years, and then would turn the property back to Locke. Locke agreed.

In January 1951 Locke executed a deed to the real property and a bill of sale to the fixtures. At the same time he and Thigpen executed a written lease agreement of the business which recited that Thigpen was lessor and Locke was lessee but was signed by Mr. & Mrs. Locke as lessor and by Thigpen as lessee. Locke's testimony is that he did not read the instruments because he understood they were being executed to carry out the December agreement and because of his trust and confidence in Thigpen. He did note that he signed one of the instruments as lessor, and this was in keeping with his understanding of the agreement to lease to Thigpen. When asked specifically why he did not read over the papers before he signed them, he answered: "I never did read any papers from Mr. Joe. He handled everything for me, all the contracts, I never had any trouble and didn't anticipate any."

Do the evidence and the reasonable inferences therefrom, related above, raise an issue of fact as to the existence of a confidential relationship between Locke and Thigpen when the deed was executed in 1951? I think they do. At the time of the execution of the instruments Locke and Thigpen had been personal and business acquaintances for three and a half years; they had occupied a business relationship of debtor and creditor for one and a half years; each had an investment in the business which by their joint efforts they were seeking to protect; Thigpen's conduct over the one-and-a-half-year period was such as to inspire and justify a special confidence; many of his own dealings with and on behalf of Locke were too lax to indicate an arms-length relationship, indicating instead a reciprocal trust and confidence; Thigpen was the adviser, the dominant adventurer, and Locke was the advised, the servient adventurer.

In my opinion a trier of facts would be justified in finding that such a confidential relationship existed as to excuse Locke's failure to read the instruments he signed in January 1951. The question does not turn on whether all of the things done by Thigpen during his association with Locke can be related to the conduct of a careful creditor, but rather on whether the association and the conduct of the parties to it were such as to create a special relationship of trust and confidence justifying Locke in failing to read the instruments as should have been done by a party to an arms-length transaction.

It will be understood that what I have said does not mean that Locke's version of the agreement preceding the execution of the 1951 deed and his statement that he did not read or know he was executing a deed must be believed. Thigpen's version of the agreement is that Locke wanted out of the grocery business and willingly conveyed the real estate and the fixtures and equipment of the business upon Thigpen's assumption and payment of Locke's debts amounting to some $9,900.00. The testimony simply presents a controverted fact issue which it is the duty of the trier of facts, and not of this court, to resolve.

I recognize that the imposition of constructive trusts in cases such as this may broaden the possibilities of fraud in avoiding business transactions which the Statute of Frauds would otherwise protect. Bogert states in his work on Trusts and Trustees, 2nd Edition, p. 150: "In various cases efforts have been made to secure an adjudication that parties in business relations were in a confidential relation to each other, but the courts have been inclined to deny such a finding, except in exceptional cases." But we have already faced up to the unsatisfactory results which may ensue and weighed them in the scales of justice. In Schiller v. Elick, 150 Tex. 363, 240 S.W.2d 997, 1001, we said:

> "It might be argued that this holding imposes a higher standard of business ethics upon the parties to a real-estate transaction than the law has a right to expect. The growth of the law has been consistently towards higher ethical standards. [cases cited]. Extending the term 'fiduciary' beyond formal relationships (as, for example, guardian and ward) widens the possibility of attack by perjury upon legal instruments, but this has been determined as not controlling in Fitz-Gerald v. Hull, supra, and cases there cited."

It cannot be said that the right of action is barred by the statute of limitations as a matter of law. The suit developed by the evidence is not one to cancel a deed for fraud but is one to impose a constructive trust. The cause of action did not accrue until Locke knew or by the exercise of diligence should have known of the breach of confidence. The representation to him, according to his testimony, was that the property would be turned back to him when the rents had paid the indebtedness, which would take five or six years. Five years from the date of the transaction expired in January 1956. Locke testified that he learned from Thigpen of the execution of the deed and that the property would not be returned to him later in 1956. His suit was filed on January 13, 1958. It is not shown conclusively that he should have obtained this information at an earlier date.

I would affirm the judgment of the Court of Civil Appeals.

WALKER and STEAKLEY, JJ., join in this dissent.