Lawrence HOOVER, Appellant,

v.

H. C. COOKE and Total Exploration Company, Appellee.

No. 1232.

Court of Civil Appeals of Texas, Corpus Christi.

March 31, 1978.

Rehearing Denied May 24, 1978.

**20**

Richard A. Hall, Gary, Thomasson, Hall & Marks, Corpus Christi, James P. Hart, Austin, for appellant.

Miller William Meredith, Jr., Walter Clay Cooke, Meredith & Donnell, Corpus Christi, for appellee.

## OPINION

BISSETT, Justice.

This is a suit to impose a constructive trust upon certain mineral interests in several oil, gas and mineral leases in Frio County, Texas. H. C. Cooke was plaintiff and Lawrence Hoover was defendant in the court below. Following a jury trial, judgment was rendered which decreed that plaintiff pay to defendant the sum of $63,574.04 as reimbursement for all costs and expenses incurred in the acquisition and development of the leases and upon such payment, "H. C. Cooke shall recover and own all of the right, title and interest of Lawrence Hoover" in the leases. Lawrence Hoover has appealed.

Cooke alleged that he made a study of the Pearsall Field, in Frio County, Texas, prepared a report thereon, and in April, 1974, delivered the Report to Hoover "in confidence and exclusively for the use of Southland Royalty Company", and that Hoover used the Report as a basis for the acquisition of interests in certain oil, gas and mineral leases in the Pearsall Field. He further alleged that prior to the acquisition by Hoover of interests in the involved oil, gas and mineral leases, a business and social relationship between him and Hoover existed which "endured for more than twenty years"; that such relationship resulted in the creation of a confidential relationship between them; and that Hoover violated the duties and obligations that arose out of that relationship of trust and confidence by intentionally using his (Cooke's) confidential information contained in the Report and other confidential information subsequently furnished him to purchase, sell and hold the affected oil, gas and mineral leases. Cooke prayed that a constructive trust be imposed upon all of Hoover's interests in the leases.

The jury, among other findings, found: 1) a confidential relationship existed between Cooke and Hoover at the time Cooke presented his Pearsall Field Report to Hoover (No. 1); 2) a confidential relationship existed between Cooke and Hoover during the period of time between the date Cooke

presented his Pearsall Field Report to Hoover and August 31, 1975 (No. 3); and 3) Cooke, his associates or employees, provided confidential information to Hoover between the date Cooke presented the Report to Hoover and August 31, 1975. (No. 4).

Hoover contends in points 1 and 4 that the trial court erred in rendering judgment in Cooke's favor because, as a matter of law, there was no evidence to support the jury's findings that a confidential relationship existed between Cooke and him, and that there was no evidence that he (Hoover) utilized confidential information received from Cooke in acquiring the leases in question.

In considering the "no evidence" points, we are required to view the evidence in its most favorable light in support of the jury's findings, considering only the evidence and permissible inferences which support the findings and rejecting the evidence and inferences contrary thereto. *Miller v. Riata Cadillac Company,* 517 S.W.2d 773 (Tex. Sup.1974).

Cooke, age 61, and Hoover, age 50, are both independent geologists who have lived in Corpus Christi, Texas, for more than twenty years prior to April, 1974. Both are graduates from the University of Texas with a Bachelor of Science Degree in Geology. Cooke graduated in 1941 and Hoover graduated in 1948. Both were highly respected in their professional field, and stood on equal footing as far as education, ability and experience is concerned. Neither had any special ability or expertise which was not possessed by the other. Neither had any dominance over the other.

The parties first became acquainted with each other in 1952 when Hoover was employed by Pontiac Refining Company as a geologist. At that time Cooke was a consultant geologist for Pontiac. Both left the employ of Pontiac sometime during the mid 1950's. Aside from being employed by the same company, Cooke and Hoover were not shown to have any business or social relationships with each other during the several years that they worked for Pontiac.

In the mid 1950's, Cooke, Hoover, B. Cochran and B. C. Garnett worked together on a uranium prospect in Karnes County, Texas. Uranium leases were obtained, which resulted in a profit to them. At or about the same time that the uranium leases were being acquired in Karnes County, Texas, Cooke engaged Hoover to make a survey of the Jackson outcrop from Live Oak County to Grimes County, in an attempt to locate uranium deposits. Cooke paid Hoover "for his time and expenses". Nothing productive came out of the survey. Following the completion of the survey relating to the Jackson outcrop, Hoover and Cooke went to the "four-corners" area of Arizona, Utah, Colorado and New Mexico, to, in the words of Cooke, "examine uranium prospects and mines being actively worked". They spent about three weeks on the trip. According to Cooke, the trip was partly pleasure, but "mostly business". There is no evidence that any kind of business relationship between Cooke and Hoover grew out of this trip.

After terminating his consulting arrangement with Pontiac, Cooke became an independent geologist, as reflected by his statement:

"I went entirely on my own, and I don't think I have done any consulting work since 1960. It has been purely an individual effort on my part to originate prospects."

In 1971 or 1972, Hoover, at Cooke's request, wrote a letter to the Texas Water Control Board and expressed his concern over the dumping of toxic wastes into Corpus Christi Bay. The record does not reveal the action, if any, which was taken by the Board.

Cooke told the jury that as a result of his previous association with Hoover, he considered Hoover a personal friend, and he felt that Hoover would keep anything that he showed him in confidence. Hoover stated that he regarded Cooke as a friend. He further stated that he expected Cooke to believe that if Cooke presented a geological report to him as a representative of Southland Royalty that he (Hoover) would hold

the contents of the report "on a confidential basis for Southland Royalty Company", because "that was my obligation to Southland Royalty Company".

The land area here involved consists of lands and oil, gas and mineral leases thereon situated in the Pearsall Field, in Frio County, Texas. The field, in the vicinity of Pearsall, Texas, produces oil from the Austin Chalk Formation. The formation is some 375 feet thick. It dips towards the Gulf at the rate of 200 feet per mile. It is divided into four zones; 1) the Upper Shaly Zone, which is 40 feet thick; 2) the Upper Fractured Zone, which is 175 feet thick; 3) the Lower Shaly Zone, which is 96 feet thick; and 4) the Lower Fractured Zone, which is 70 feet thick. A greater part of the production comes from the Upper Fractured Zone, but there has been some production from the Lower Fractured Zone. The other two Zones generally are non-productive. The formation has no primary porosity and where oil is found, the production is due to secondary porosity caused by faulting, fracturing and joints due to structural movement. It was discovered in 1933 and was developed in two phases, 1933–1941 and 1948–1956.

Particularly of interest in this suit is the east flank of the field, an area about 11 miles long and 5 miles wide. The typical well in the field would produce most prolifically initially, but would rapidly decline to a daily production of three or four barrels in most instances. As a result of the extensive drilling in the Pearsall Field and the required reporting of such activities to the appropriate state agency, the nature and extent of the Pearsall Field area anticline in the Austin Chalk Formation and its production potential based upon conventional drilling techniques then in vogue became matters of common knowledge.

Through 1973, the 129 wells in the field produced 6,370,000 barrels of oil for an average of 49,000 barrels per well. The price for oil from 1933 to 1956 varied from $1.50 to $2.44 per barrel. The operators of the wells, at best, broke even. Drilling virtually ceased in 1956, and did not resume until September, 1974.

During the first phase, 1933–1941, the wells were completed in the Austin Chalk formation by setting casing and "shooting" the wells at selected intervals in 300 feet of open hole with nitroglycerin, followed by a small amount of acid. During the second phase, 1948–1956, the completion practice was to drill through selected zones in the formation, set casing and then pump a modest amount of acid in about 400 feet of open hole. The completion methods used in the first phase resulted in higher initial flows and greater ultimate recoveries of oil than those used in the second phase.

The technique of "fracturing" was introduced into South Texas in the middle 1950's. Several wells were fractured in open hole and the resulting ultimate recoveries were equal to, or greater, than the early recoveries when the wells were shot with nitroglycerin. Most of the wells that were fractured were wells that would not respond to acidizing. In the late 1960's improved fracturing techniques were perfected.

Cooke made a detailed study of the Pearsall Field in 1954. He concluded that several thousand acres on the east flank of the field were proven to be productive, but it was not then feasible to develop this area due to the price of oil prevailing at that time; however with the dramatic increase in the price of oil in 1973, he reviewed his study. He prepared a report thereon dated April, 1974. The Report was in essay form and was supported by footnotes containing maps, well data, cross-section plotting, core records, electric logs, reservoir details, record of production from each well in the field, production curves, his conclusions, and concurring opinions of two other geologists. Everything in the Report except the contours shown on the maps, the cross-section plotting, the opinions of the two geologists and Cooke's own conclusions, was prepared from either public records or from articles in publications pertaining to the Pearsall Field.

Cooke did not have the funds to develop the area himself; therefore he prepared the

Report with a view toward obtaining buyers of leases with substantial funds to invest, such as wealthy individuals or independent oil companies, who, hopefully, would drill new wells in the field. Cooke was funded by J. Lee Youngblood, a prominent Dallas oilman, who, in association with Cooke, purchased numerous leases in the field in an attempt to put drilling deals together. Cooke then decided to present these leases to oil companies who were financially able to drill and complete wells in the Austin Chalk Formation. The first company contacted was Southland Royalty Company. In early May, 1974, Cooke, who had heard that Hoover was the representative for Southland in the Pearsall area, telephoned Hoover and asked him if he was such a representative. Hoover answered in the affirmative, and Cooke told him that he "had a prospect, some acreage and some ideas on the flank of the Pearsall Field". When asked if Southland would be interested, Hoover answered:

"I will let you know."

Southland showed interest and Cooke delivered a copy of his Report to Hoover in connection with Cooke's offer to assign the Harris Lease (4,000 acres) to Southland. There was no discussion of the Report between Cooke and Hoover at that time other than a general discussion of its generalities and potential. Cooke testified:

"Q Were you submitting that report to Lawrence Hoover as an individual or as an agent, as he told you, for Southland Royalty Company?

A As an agent for Southland Royalty Company.

Q If he wasn't representing Southland Royalty Company, would you have ever shown him that report?

A No, not at all."

Cooke further testified that his purpose in contacting Hoover was "to sell the Harris lease" to Southland, and that he "did not take it to Mr. Hoover per se".

Hoover submitted the Report to Southland and recommended that it acquire the north 500 acres of the 4,000 acre Harris lease and that it drill two wells on the

assigned acreage as a test of the techniques advocated by Cooke in the Report. Southland, after a study of the Report, made a counter offer to Cooke; as a result, Southland acquired the lease as to 2,000 acres and obtained an option on an additional 500 acres. Cooke received a cash consideration and an overriding royalty for the assignment. Southland kept the Report. Cooke, after completing his deal with Southland, considered the copy of the Report to be the property of Southland. He said: "when you buy the lease you get the Report". Cooke's concept of what should be done in order to produce oil profitably from the Austin Chalk is best described in a letter which Hoover wrote to Southland, when he recommended that Southland acquire the north 500 acres of the Harris lease and drill two wells thereon. The letter, in part, reads, as follows:

". . . Mr. Cooke reasonably concludes that application of the 'Pine Island' technique of selectively perforating and acid-fracturing the several separate oil bearing zones, within the Chalk would result in even better yields and that such yields would be profitable at today's improved prices for crude . . ."

At or about the same time that Cooke was negotiating with Southland concerning the Harris lease, Cooke, who had acquired other leases in the Pearsall Field, was also attempting to sell the leases to other oil companies. He contacted ten such companies and delivered a copy of the Report to each. Five companies purchased leases from Cooke; each kept a copy of the Report with the consent of Cooke. The remaining five companies did not purchase a lease from Cooke; they returned all copies of the Report.

Under the agreement between Hoover and Southland Royalty, Hoover was to receive a 3% overriding royalty on all leases acquired by Southland which were originated by Hoover. In addition, it was also agreed between them that Hoover was free to acquire leases for himself and to the exclusion of Southland once the leases had been submitted to and refused by South-

land Royalty. Hoover did not tell Cooke of such an agreement. Southland assigned Hoover a 3% overriding royalty in the Harris lease. That lease is not involved in this suit.

Southland began drilling on the Harris lease in September, 1974. Some of the other companies who had purchased leases from Cooke also began to drill shortly thereafter. From that date until November, 1974, when Cooke left on a seven month's vacation (sometime referred to in the record as a "fishing cruise"), Cooke and Hoover exchanged information concerning development operations in the field. During this time, Southland asked Hoover to locate unleased acreage near the Harris lease. Hoover called Cooke, told him of Southland's request, and asked the name of a lease broker to assist him. Cooke did not voice any complaint or opposition, but recommended Leroy Hoskins, who had been working for Cooke as a broker in the field since April, 1974. Hoover sought Hoskins' services whereupon Hoskins called Cooke and got his permission to work for Hoover and Southland. Hoskins located the Burleson tract which was not then under mineral lease. Hoover called Cooke and asked if he would mind if "we" purchased it. Cooke told him that it would be all right if he (Cooke) was assigned a 1% overriding royalty. Southland leased the land for oil development. Southland assigned a 1% overriding royalty to Cooke. Hoover explained the assignment by stating that at the time Southland acquired the Burleson lease the Harris lease was only two months old and that Southland was still relying on the Report, and that it seemed fair to Southland at that time to assign an overriding royalty to Cooke. Southland also assigned a 2% overriding royalty in the Burleson lease to Hoover. Cooke did not seek to recover Hoover's overriding royalty in this suit. Hoskins also located a tract that was owned by Mannas and Johnston for Southland. Cooke, when he found out that Southland proposed to lease the tract, called Hoover and told him: "I'm already negotiating a deal on this"; whereupon, Hoover told Hoskins "to cease negotiations" for this particu-lar tract. Hoskins complied with the request. Cooke later leased the Mannas and Johnston tract, which proved to be productive.

Cooke's office was occupied by Mrs. Phyllis Angel, his secretary, and by Mr. Charles Williams, an independent geologist, during the time that Cooke was away on vacation. Before Cooke left, he instructed his secretary to give Hoover and certain other people who were associated with Cooke, upon request, any information in the office relating to the Pearsall Field. Mrs. Angel testified that during that interval, Hoover was in the office frequently and that Hoover would give her drilling reports on the wells which Southland was drilling on the Harris lease, and she would give him "reports what Bruce Fox's wells were doing on his Mannas and Johnston lease". She also stated that Hoover made copies of maps relating to the Pearsall Field. She further testified that while no restriction or limitations were placed on the use of the information contained in the Report by the first "eight or ten" persons who purchased leases from Cooke, those persons who were later contacted as prospective assignees of Cooke were delivered copies of the Report with the following limitation:

"If you decide to buy this lease, then you may use the Report. Otherwise, you may not."

Mrs. Angel did not specify or identify any information or data, if any, which was set out on the maps. Mrs. Angel did not testify as to any contents in the drilling reports on the Mannas and Johnston lease. She stated that she did not know whether Hoover utilized any of the information obtained by him from Cooke's office in acquiring any lease in the Pearsall Field.

Mr. Williams testified that he knew that Hoover was Southland's representative; that Cooke had sold some acreage to Southland; that Hoover came to the office during Cooke's absence; and that he gave Hoover anything he asked for because he knew that when Cooke "sells a man a deal, he accommodates him by giving him any additional information he may need to  .   .   .

give him a better idea to drill up his prospect". He also stated that when Hoover came by the office, he "got the big base map of the area which just has the surface and wells and leases spotted on it", and he would take it to his office and would "spot it up to date". The map was not a "subsurface geological map". Williams stated that he did not know from his own personal knowledge if Hoover used any of the information which he obtained from Cooke's office in evaluating the "Hicks" lease; that geologists do "pretty freely" exchange information on logs, wells production information, and the like; and that much of this information is required to be made public by the Railroad Commission. Williams believed that he gave Hoover a map that had some geological information on it, which he called a "maverick" map, but he neither knew who made it nor just what was shown thereon; such a map was not introduced in evidence.

Hoover testified in detail concerning the information which he obtained from either Cooke or his office from April, 1974 until August, 1975. He was very specific in that respect. According to his testimony, he obtained from Cooke, or from Mrs. Angel or from Williams, the following items and information: 1) a copy of a map which had been included in the Report as an exhibit; 2) a copy of a blank base or ownership map of the Pearsall Field; 3) one or two copies of a cross section that had been included in the Report as exhibits; 4) one or two copies of the drilling progress reports on the Fox and Holland wells No. 1 and 2, and the same information on the Mannas and Johnston wells; 5) a copy of a map bearing the name of Bruce Fox designated at the bottom as "H. C. Cooke, geologist"; 6) a "slant-hole drilling" article on the Pearsall Field area published in the Journal of Petroleum Geology; 7) two summaries of well drilling and completion costs; and 8) "a stack of electrical logs". The items referred to in 1), 5), 6) and 7) above were personally delivered to Hoover by Cooke. Hoover testified that the only reason for obtaining the copy of the map, which was included as an exhibit in the Report, was because:

"Southland Royalty had asked me to recommend a location for the initial well on the Harris lease, and I was in a hurry to recommend such a location to them."

At that time, Hoover did not have ready access to the Report and its exhibits since they were then in Southland's office in Midland, Texas.

Fargason Energy, Inc. (who is not a party to this suit), as lessee, acquired an oil, gas and mineral lease from David W. Hicks, et al, as lessor. The lease was dated May 14, 1975, covers 1660 acres in the Pearsall Field, and will henceforth be referred to as the "Hicks" lease. It is located 5 to 6 miles east of the Harris lease. In late May or early June, 1975, the president of Fargason Energy, Inc., contacted Hoover to see if he was interested in acquiring the Hicks lease. Hoover submitted the offer to Southland, but the latter refused to buy it. Thereafter, and in early June, 1975, Hoover, for his own account, purchased the Hicks lease from Fargason Energy, Inc. Five wells were drilled and completed on the lease. Hoover then engaged Mr. Frank N. McMillan, to buy other unleased acreage on the east flank of the Pearsall Field. McMillan acquired several leases, all of which were submitted to Southland. Those refused by Southland were purchased by Hoover. All of the leases originally obtained by McMillan except the Clyde Cox and Margaret Johnson leases were eventually assigned to parties other than Southland. Hoover retained either overriding royalties or interests in the working interest of those leases.

According to Hoover, twenty wells had been completed on the east flank of the Pearsall Field between the fall of 1974 and June, 1975, and twenty-nine wells were drilling or had announced locations. Cooke's testimony was that some eighty-five wells had been drilled in the area during that period of time. By January, 1975, Cooke and his associates had acquired oil, gas and mineral leases on about 14,000 acres in that portion of the Pearsall Field which Cooke believed to be highly productive. By early September, 1975, Hoover

had acquired interests in about 15,000 acres in the area that Cooke also thought was productive. This acreage included the Harris lease and three other leases (the Burleson lease of 200 acres, the Cox lease of 793 acres and the M. Johnston lease of 1,758 acres), which were then owned by Southland; Hoover owned an overriding royalty in each lease by virtue of assignments from Southland. Cooke sought to recover the overriding royalties on both the Cox and the M. Johnston leases.

Hoover testified that the maps contained in the Report and a copy of a map contained therein which he later obtained from Cooke's office were useful in deciding the location for Southland's No. 1 Harris well. He said that he had a draftsman add information on to the base map which he obtained from Cooke's office so as to extend it to the area of the Hicks lease and east of the lease, but at that time he did not get the base map to buy leases, since there was no geological information on the map. In January, 1975, Hoover hired a man to make the well information on the map current. With respect to the use of the drilling cost reports of the Pearsall wells which Cooke furnished him, Hoover said that he already knew the costs of drilling a well from his work for Southland operations in connection with the drilling of the first well on the Harris lease.

Cooke, Williams and Hoover, all independent geologists, agreed that the key to the drilling of new wells in the Pearsall Field in 1974–1975 was Cooke's concept of fracturing the new wells by the techniques developed in the late 1960's. They further agreed that all of the information necessary to justify such drilling was supplied by a mere reading of the Report.

The Court, in *Peckham v. Johnson*, 98 S.W.2d 408 (Tex.Civ.App.—Fort Worth 1936, aff'd in 132 Tex. 148, 120 S.W.2d 786), at page 416, construed the term "confidential relationship" as:

> " . . . covering every form of relation between parties wherein confidence is reposed by one in another, and he relies and acts upon the representations of the other and is guilty of no derelictions on his own part . . . "

A "confidential relationship" is a "two-way" street; one party must not only trust the other, but the relationship must be mutual and understood by both parties, as emphasized in *Furr's, Inc. v. United Specialty Advertising Company*, 385 S.W.2d 456 (Tex.Civ.App.—El Paso 1964, writ ref'd n. r. e., *cert. denied*, 382 U.S. 824, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965)), in these words:

> "[C]onfidential relationship is a two-way street: if the disclosure is made in confidence, the 'disclosee' should be aware of it. He must know that the secret is being revealed to him on the condition he is under a duty to so keep it . . . "

The term "constructive trust" was defined in *Talley v. Howsley*, 142 Tex. 81, 176 S.W.2d 158, 160 (1944), as follows:

> " . . . 'A constructive trust is a relationship with respect to property, subjecting the person by whom the title to the property is held to an equitable duty to convey it to another, on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property'."

A constructive trust does not arise because of an intention to create it by the parties involved. "It is imposed by law because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property". *Omohundro v. Matthews*, 161 Tex. 367, 341 S.W.2d 401 (1960).

A confidential relationship does not of itself give rise to a constructive trust, but an abuse of confidence rendering the acquisition or retention of property by one person unconscionable against another suffices generally for the imposition of a constructive trust upon the affected properties. The courts are careful not to limit the rule or the scope of its application by a narrow definition of confidential relationships. An abuse of confidence within the rule may be an abuse of either a technical fiduciary relationship, i. e., attorney and

client, guardian and ward, joint adventurers, partner and partner, trustee and beneficiary, etc., or of an informal relationship where one person trusts in and relies upon another, whether the relationship is moral, social, family or purely personal. *FitzGerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256 (1951); 76 Am.Jur.2d, Trusts, § 228.

■ While the tendency of the courts is to construe the facts presented liberally in favor of the confider against the confidant in determining whether a confidential relationship exists for the purpose of raising a constructive trust where there is an abuse of the information gained by the confidant, nevertheless, a constructive trust "must be used with caution" because it "does not arise on every moral wrong" and "it cannot correct every injustice". *Pope v. Garrett,* 147 Tex. 18, 211 S.W.2d 559, 562 (1948).

■ Although it is well established that confidential relationships may, and often do, arise informally from "moral, social, domestic or purely personal" relationships, it is equally well established that mere subjective trust alone is not enough to transfer a relationship into one of trust and confidence that will constitute a confidential relationship which will dictate the imposition of a constructive trust. *Thigpen v. Locke,* 363 S.W.2d 247 (Tex.Sup.1962). The fact that one businessman trusts another does not create a constructive trust. *Tyra v. Woodson,* 495 S.W.2d 211, 213 (Tex.Sup. 1973).

Of particular importance to the disposition of this case are the observations made in *Consolidated Gas & Equipment Co. v. Thompson,* 405 S.W.2d 333 (Tex.Sup.1966), where the Court, speaking through Justice Greenhill, at page 336, said:

> "The fact that people have had prior dealings with each other and that one party subjectively trusts the other does not establish a confidential relationship. *Thigpen v. Locke, supra.* That opinion reasoned that '[b]usinessmen generally do trust one another, and their dealings are frequently characterized by cordiality . . . .'"

■ Also of importance to the disposition of this appeal is the well established rule that in arm's-length transactions between two businessmen where both stand on equal footing so far as education, ability, experience and business acumen is concerned, as is the case here, each party must exercise due care for the protection of his own interests, and a failure to do so is not excused by mere subjective trust or confidence in the honesty and integrity of the other party. *Courseview, Inc. v. Phillips Petroleum Co.,* 158 Tex. 397, 312 S.W.2d 197 (1957). The fact that a party unilaterally has placed confidence in another is not sufficient to excuse the failure to adequately protect his own interests when the means to do so are readily at hand. *Lindsey v. Dougherty,* 60 S.W.2d 300 (Tex.Civ.App.— Amarillo 1933, writ ref'd).

■ After carefully reviewing the evidence and permissible inferences as a whole most favorably to Cooke, we hold that there is no evidence of that type of confidential relationship between Cooke and Hoover envisioned by our appellate courts that would impose a constructive trust. There is no evidence which will permit or justify, under the guidelines laid down by our Supreme Court, as hereinbefore noted, the imposition of a constructive trust on Hoover's interests in the leases here involved which would divest Hoover of such interests and vest the same in Cooke because of a violation of any relationship which existed between them. Points 1 and 4 are sustained.

Hoover particularly complains of that portion of the judgment which divested him of his interests in the Clyde Cox and the Margaret Johnson leases. He maintains that he acquired his interest in those leases from Southland under his agreement with Southland, and that Cooke had no lawful right to question either of those transactions. We agree. The Cox tract (793 acres) was leased by the landowners, as lessors, to Frank N. McMillan, as lessee, on June 6, 1975, and the Margaret Johnson tract (1,758 acres) was leased by the landowners, as lessors, to McMillan, as lessee, on June 7, 1975. At that time, McMillan was search-

ing for unleased land in the Pearsall Field on behalf of Hoover. At Hoover's request, the leases were submitted to Southland, who purchased them. Hoover and McMillan each received a 2½% overriding royalty under each lease. We hold that the overriding royalties acquired by Hoover under the Cox and Johnson leases constituted compensation which he was entitled to receive under his agreement with Southland. No basis was shown for divesting Hoover of his interests in those leases and vesting the same in Cooke. Point 18 is sustained.

In view of our sustaining Hoover's points 1, 4 and 18, the judgment of the trial court must be reversed. Consequently there is no need to dispose of Hoover's remaining points.

The judgment of the trial court is reversed and judgment is here rendered that H. C. Cooke, plaintiff-appellee, take nothing by his suit against Lawrence Hoover, defendant-appellant.

It is the further judgment of this Court that the cashier's check No. 431526 in the amount of $63,574.07, payable to the order of Lawrence Hoover, and received by the District Clerk of Nueces County, Texas from W. C. Cooke on January 28, 1977, be returned by the Clerk to W. C. Cooke.

REVERSED AND RENDERED.