**Joe TREVINO and wife, Jovita Trevino, Appellants,**

v.

**E. E. SAMPLE and Edgar A. Wallace, substitute trustee, Appellees.**

No. 6721.

Court of Civil Appeals of Texas, El Paso.

April 5, 1978.

Opinion on Motion for Rehearing Denied May 3, 1978.

Joe Mike Egan, Jr., Kerrville, for appellants.

Law Offices of Edgar A. Wallace, M. Scott Stehling, Kerrville, for appellees.

## OPINION

OSBORN, Justice.

This is an appeal from a judgment non obstante veredicto in a case arising out of the refinancing of a note and a subsequent attempted foreclosure of a lien on a house in Kerrville. The Appellants brought suit initially to enjoin a sale under a deed of trust. A temporary injunction was granted pending a trial on the merits. The case was tried upon theories of breach of a confidential relationship, fraudulent misrepresentations and usury. The jury found for the Appellants on the first two theories, and found actual and exemplary damages and a sum for attorney's fees. We affirm the judgment entered n. o. v.

It is necessary to review many of the facts from a week-long trial, which included

over twenty witnesses and nearly fifty exhibits. Joe Trevino and wife, Jovita, lived in Kerrville for many years. Mr. Trevino could not read, write or speak the English language. His wife could speak and understand English, but they both were without any formal education. Joe worked as a sheep shearer, and his wife did domestic work and was employed occasionally at the Kerrville State Hospital. Each summer, they usually travelled to the northeast part of the United States to do migrant farm work for about four months, always returning to Kerrville. In 1958, they bought a small house in Kerrville from A. L. Lewis. They paid partly in cash and signed a note for $1,625.00, which was payable in monthly installments of $20.00 each.

E. E. Sample is also a longtime resident of Kerrville and has known Mr. and Mrs. Trevino for many years. He owns some real estate and operated a small loan business for several years.

In 1964, Mr. Sample made a loan to Mr. Trevino to be used for the purchase of a truck. In 1966, he made a loan to Mr. Trevino to be used for the purchase of an automobile. In April, 1967, he rented a house to Mr. and Mrs. Trevino because the family was too large for the one they had purchased from Mr. Lewis nine years earlier. At that time, Mrs. Trevino began to rent the house they owned and use the rent money to make the note payments to Mr. Lewis. Shortly thereafter, Mr. Lewis moved to Cuero and it was difficult for Mrs. Trevino to make her cash payments to him. She asked Mr. Sample about refinancing her note with him and continuing to use the rent money to make her monthly payments. At that time, the balance on the Lewis note was $1,426.76. Mr. Sample agreed to refinance the Lewis note and, on July 3, 1968, the Trevinos executed a new note to Mr. Sample for $1,999.26, with monthly payments of $35.00 each. In addition to paying off Mr. Lewis, the new note included sums necessary to pay back taxes, purchase a title policy, pay attorney's fees and recording fees.

A few days after the note and deed of trust were executed, Mr. and Mrs. Trevino left Kerrville for nearly four months to do migrant farm work and did not return to Kerrville until late October or November, 1968. They then remained in Kerrville until March 6, 1969, when they moved to Indiana where they have continued to live since that time. During the time they lived in Kerrville, Mrs. Trevino had at various times borrowed small cash sums from Mr. Sample which were paid back at the end of the month. When she worked at the State Hospital, she regularly borrowed money from Mr. Sample and signed an authorization for him to pick up and endorse her check each month to apply toward the payment of sums she had borrowed. Out of these checks, Mr. Sample was, on occasions, paid the $35.00 monthly note payment. No payments were made by Mr. or Mrs. Trevino on the note after they moved to Indiana in 1969.

It was the contention of Mrs. Trevino that part of the agreement in connection with refinancing the note with Mr. Sample was that he would rent the house each year while she and her husband were out of the State doing migrant farm work. Mr. Sample denied that any such agreement was made. In this connection, Mrs. Trevino testified as follows:

"Q. What was your understanding of what your arrangement with Mr. Sample was on the refinancing?

"A. The only thing I suggest to him, 'If you refinance my house,' that 'whatever I get from rent on the house would be added to the note'—to his—you know, to the note he was going to refinance me. That was my understanding between me and him. And I talked to Joe about it, and Joe say, 'Okay, whatever we get from the rent, we can add it into the—as payment into the note.'

"Q. Okay, was there any discussion between you and Mr. Sample about the house rent when you'd be out of town?

"A. Yeah, we talk about it, and I told him that whenever I'm out of State—He knew I was going out of the State for

four months out of the year, so, I told him that anytime I'm out of town, he have the right to collect rent to put it into the note.

"Q. What did he say?

"A. 'All right.'"

Mr. Sample did in fact rent the house, but there were occasions when it was vacant and the note payments were not made. On some occasions, he applied the rent money to pay debts incurred in making repairs on the house. On one occasion, he telephoned Mrs. Trevino in Indiana and advised her that the house was vacant, but she was unable to return to Texas at that time. Later, the family came to Kerrville, but she could not locate Mr. Sample. A letter advising of default and foreclosure was first sent in 1974. There was no sale at that time. In October, 1975, another letter giving notice of a foreclosure sale was sent to Mr. and Mrs. Trevino. At that time, they retained counsel and, in November, 1975, obtained a temporary injunction to enjoin any sale. The trial on the merits followed in April, 1977.

The jury found: (1) a confidential relationship existed between the parties when they discussed refinancing the Lewis note and when the Sample note was signed; (2) that Sample abused his confidence by failing to disclose to Jovita Trevino the significant aspects of the Lewis note transaction prior to having the Sample note and deed of trust signed; (3) that Mr. and Mrs. Trevino would not have signed the Sample note and deed of trust except for the abuse of confidence; and (4) this resulted in injury to Mr. and Mrs. Trevino. They also found: (5) that prior to the signing of the note and deed of trust, Sample represented that he would keep the property rented and collect the rent when the Trevinos were out of State; (6) that such representations were made by Sample with the intention that they would not be kept; (7) that such representations were believed and relied upon by the Trevinos; and (8) that such representations were a material inducement to the Trevinos in executing the note and deed of trust. The jury also made findings favorable to the Appellants with regard to the failure of Mr. Sample to properly credit some rental payments, the damages which they sustained, and attorney's fees.

The critical issues in this appeal are Issues Nos. 1 and 5. By the answer to the first issue, the jury found that a confidential relationship existed between Mr. Sample and Mrs. Trevino when they discussed financing the Lewis note and when the note payable to Sample was executed. The Appellants alleged in their last amended pleading that they trusted Mr. Sample explicitly, and that there existed a "fiduciary relationship" between these parties. The trial Court concluded that there was no evidence to support the jury's answer to Special Issue No. 1.

To sustain the action of the trial Court in entering judgment non obstante veredicto, it must be determined that there is no evidence having probative force upon which the jury could have made the findings relied upon. *Burt v. Louchausen*, 151 Tex. 289, 249 S.W.2d 194 (1952). In passing upon this issue, all testimony must be considered in a light most favorable to the party against whom the judgment was entered, and every reasonable intendment deducible from the evidence is to be indulged in such party's favor. *Leyva v. Pacheco*, 163 Tex. 638, 358 S.W.2d 547 (1962).

The Courts of this State have long recognized that confidential relationships may arise not only from the technical fiduciary relationships such as attorney-client, trustee-cestui que trust, and partner-and-partner, which create such relationships as a matter of law, but they may also arise from moral, social, domestic or purely personal relationships. *Thigpen v. Locke*, 363 S.W.2d 247 (1962). But this case does not involve a close personal family relationship between two families as existed in *Holland v. Lesesne*, 350 S.W.2d 859 (Tex.Civ.App.—San Antonio 1961, writ ref'd n. r. e.). Nor does it involve a professional and close personal friendship as existed between the parties in *Kalb v. Norsworthy*, 428 S.W.2d 701 (Tex.Civ.App.—Houston [1st Dist.] 1968, no writ).

■ In the case at bar, the parties always dealt with each other in "arms-length" transactions involving loans made by one party to the other. Although it may have been financially unwise for Mrs. Trevino to refinance the note with Mr. Sample and enter into a new note which was in a larger principal sum, with larger monthly payments and a higher interest rate, nevertheless, all of these facts were evident on the face of the note that was signed in a transaction which originated at the request of Mrs. Trevino, and not Mr. Sample. Certainly, there was no wrongdoing upon his part in requiring back taxes be paid. It is customary for lenders to receive title policies covering the land on which a lien is given as security for a loan. Obviously, it was necessary to pay attorney's fees and recording fees. Quite possibly, Mr. and Mrs. Trevino did not understand these additional charges which did substantially increase the size of the new note as compared to the old one. But Mrs. Trevino did acknowledge in her testimony that she was told that "that note has gone from fourteen to nineteen hundred because there was taxes—I mean there was interest going into that note, and other things had to be taken care of."

In *Thigpen v. Locke*, supra, the Court reaffirmed that principle that parties to a contract have an obligation to protect themselves by reading what they sign and, absent fraud, may not excuse themselves from the consequences of failing to meet that obligation because they unwisely trusted the other party. We believe the following language from the opinion in that case is controlling in this case. There, the Court said:

"Taking the testimony as a whole and most favorably to the respondents, we hold that in this case there is not such evidence of justifiable trust and confidence as will create a fiduciary relationship. We may assume that respondents did trust Mr. Thigpen; they have testified so time and time again, but mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship * * *.

* * * * * *

"Our holding in no way detracts from the principle that a relationship of trust and confidence may be shown to arise informally from purely personal relationships. All we hold is that respondents do not testify to facts—other than their own subjective feelings—which show that their relationship with Thigpen was anything more than a debtor-creditor relationship."

Also see *Cockrell v. Craugh*, 338 S.W.2d 516 (Tex.Civ.App.—Austin 1960, no writ), where, in the opinion on motion for rehearing, the Court found that no confidential relationship existed where good friends who " 'had utmost trust and confidence in him' " dealt with each other at arms length.

We overrule the first point of error and sustain the trial Court's finding that there is no evidence to support the answer to Special Issue No. 1. It is not necessary that we consider Issues Nos. 2, 3 and 4, which were conditioned upon a favorable answer to the first issue.

■ We now turn to a consideration of Special Issue No. 5 and the jury finding that Sample represented to the Trevinos that he would keep the property in question rented and collect the rentals whenever the Trevinos were out of State. We review this finding under the same rules as applied to our review of the first issue.

Mr. Trevino testified that Mr. Sample did rent the house during the four months they were gone in 1968. He did not testify to any arrangement with or representations by Sample prior to executing the note and deed of trust. Mr. Sample testified that he "made no agreement in any way to manage that property or look after it for them." The only other witness with regard to this issue was Mrs. Trevino. As noted earlier in this opinion, she testified as to an understanding that " 'whatever I get from rent on the house would be added to the note'— to his—you know, to the note he was going to refinance me. That was my understanding between me and him." She went further and said "I told him that anytime

I'm out of town, he have the right to collect rent to put it into the note." She also testified that just before they left for Indiana in 1968, she told Mr. Sample: " 'If you find any renters, to rent the house;' that he had the right to do it in order to get that note back paid." This statement does not indicate any agreement on his part to be responsible for keeping the house rented, but even if it did, such conversation occurred after, not before, the note and deed of trust were executed.

She did testify with regard to repairs made to the house and an understanding that whenever she was gone, he would take care of the house. But there is no contention that he did not take care of the house; in fact, repairs were continually made and a new roof was installed and a hot water heater was installed, along with repairs to the plumbing. We conclude that there was no evidence to support the jury's answer to Special Issue No. 5, and the trial Court properly disregarded that finding. It is not necessary to consider Special Issues Nos. 6, 7 and 8, which were conditioned upon a favorable answer to Special Issue No. 5. Point of Error No. 2 is overruled.

Since all other issues were conditioned upon the favorable findings to Special Issues Nos. 1 through 4, or 5 through 8, those issues become immaterial to a decision in this case. It likewise becomes unnecessary to consider the other points of error. The judgment of the trial Court is affirmed.

## ON MOTION FOR REHEARING

PRESLAR, Chief Justice, dissenting.

I respectfully dissent and would hold that there is some evidence to support the jury's finding on Special Issue No. 1 that a confidential relationship existed.