# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

═══════════════
## NO. 03-03-00709-CV
═══════════════

**Partners in Building, L.P., Appellant**

**v.**

**Bryan Joseph Jamail, Appellee**

═══════════════════════════════════════════════════════════════════════
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
### NO. GN201598, HONORABLE PAUL DAVIS, JUDGE PRESIDING
═══════════════════════════════════════════════════════════════════════

## M E M O R A N D U M   O P I N I O N

This is a dispute between Bryan Jamail, a property developer, and Partners in Building ("PIB"), a homebuilder, concerning the enforceability of a settlement agreement they entered into after PIB attempted to terminate a previous sales contract. The district court ordered PIB to perform under the terms of that settlement agreement. PIB claims in six issues on appeal that the trial court erred (1) because Jamail failed to plead that he was able to perform under the terms of the agreement; (2) in finding that the settlement agreement superceded their previous sales contract; (3) in concluding that Jamail substantially completed his duties under the original contract; (4) in determining that PIB did not plead an affirmative defense; (5) because the evidence establishes the existence of a unilateral mistake; and (6) because it was impossible for Jamail to perform under

the terms of the agreement on the date of trial. For the reasons stated below, we affirm the judgment of the district court.

**BACKGROUND**

In late 1998, Jamail purchased thirty acres off Highway 290 in southwestern Travis County. In June 2001, he entered into a contract to sell a section of the property ("Section 4"), subdivided into twenty-seven lots, to PIB. According to the terms of the sales contract, Jamail was to improve the property and obtain the necessary permits for subdividing the property so that PIB, upon purchase, could construct houses on the lots. Upon Jamail's "substantial completion" of contract terms, PIB was to first buy eight of the subdivided lots and then buy four lots every three months until PIB had purchased all the lots constituting Section 4. The price for each lot was set at $70,000. "Substantial completion" was defined to require Jamail to have installed operational water lines with actual water service, asphalt streets with curbs, stormwater drainage facilities, streetlights and signs in accordance with local government requirements, and underground electric and telephone lines. In addition, Jamail was to have ensured that each lot was surveyed and physically pinned and staked; that each lot was free of construction debris, excavated rock, boulders, and cut trees; and that any restrictive covenants were previously approved by PIB and recorded. If Jamail failed to "substantially complete" the subdivision improvements by September 1, 2001, PIB was allowed to unilaterally terminate the contract. If not "substantially complete" by March 15, 2002, Jamail could unilaterally terminate the contract.

On June 19, 2001, the parties amended the contract by adding several conditions to the definition of "substantial completion." These additional conditions included requirements that

2

Jamail construct sidewalks, obtain approval for a stormwater management facility, obtain approval for a landscaping maintenance and irrigation system in street right-of-ways from PIB and the City of Austin, receive a contributing zone permit for the Edwards Aquifer from the Texas Commission on Environmental Quality, and sign a release of obligations with PIB.

Jamail admits that he did not substantially complete the improvements by September 1, 2001. However, PIB did not immediately exercise its right to terminate the contract. Instead, between September 1, 2001, and February 13, 2002, PIB submitted house plans to the subdivision architectural control board, moved its sales trailer onto a lot in Section 4, and began marketing lots. However, on February 13, 2002, PIB faxed Jamail a letter in an attempt to terminate the contract. In that letter, PIB listed the items it believed were still incomplete and stated that it no longer had time to begin construction of homes to market during the upcoming summer marketing season. On May 14, Jamail filed suit in district court, alleging (i) that he had substantially performed under the terms of the contract by February 11, 2002; (ii) that PIB had represented after September 1, 2001, the date its right to terminate had vested, that it intended to close on the properties covered by the contract; (iii) that he relied on that representation in developing the property; and (iv) that PIB's actions since February 13 constituted a default under the contract. Jamail sought specific performance.

After discovery began, the parties entered into the settlement negotiations that are now at the center of the dispute. On January 24, 2003, Jamail's attorney, Brian Bishop, faxed a letter setting forth Jamail's understanding of the proposed settlement terms to Henry Novak, PIB's attorney. In that letter, Bishop stated that part of the settlement would include a commitment by PIB

3

to purchase three lots out of the "currently available" lots in Section 4 at the "current market price list for said lots." In handwriting on that same letter, Bishop indicated that the price for each lot would be $70,000. On January 27, Novak responded by letter, confirming that PIB agreed to the settlement terms. In that letter, however, he did not mention any purchase price for the lots. Bishop responded to that letter and reiterated the $70,000 per lot purchase price. In the final written communications between Bishop and Novak, all explicit references to prices were $70,000.

Novak then drafted a written agreement, entitled "Rule 11 agreement." According to the Rule 11 agreement, PIB would purchase three lots from Jamail "at Jamail's current marketing prices." PIB would select the three lots "from Jamail's current price list for Section 4 lots, a copy of which is attached hereto as Exhibit A." Closing would occur on February 27. The agreement further provided that PIB would begin constructing houses on at least two of those properties by March 28, and Jamail warranted that he had completed all subdivision improvements to those lots and had obtained all government approvals.

Novak faxed the final version of the Rule 11 agreement to Bishop for his signature without the purchase price list that was to have been attached. Bishop signed and returned the agreement, also without a price list attached. At that point, Novak noticed that he no longer had a copy of Jamail's "current price list." He asked Bishop to fax a copy to him for attachment to the agreement. Bishop sent a price list, which Novak received on January 28. Novak attached it to the Rule 11 agreement. Novak filed the agreement with the district court on January 30, 2003. *See* Tex. R. Civ. P. 11. However, neither Novak nor any officer of PIB specifically read the price list sent by Bishop before Novak attached it and filed it with the Rule 11 agreement.

The filed "current price list" included a small map of the property with the lot divisions indicated. According to that price list, Section 4 of the development contained twenty-seven lots, nine of which were sold or reserved at that time. In block A of Section 4 (a total of ten lots), lots 1 through 5 and lots 8 through 10 were listed as sold or reserved, and lot 2 of block B was listed as sold. Prices for the remaining lots included two lots at $59,500, two lots at $62,500, and the remaining lots at $70,000.[1]

Upon receiving a copy of the filed Rule 11 agreement, John Bily, PIB's chief executive officer, called Novak, asserting that the attached price list did not reflect the prices to which he believed the parties had referred during settlement negotiations. Novak then contacted Bishop, who told him that no mistake had been made and that the price list he sent reflected the prices as of the date the list was sent, January 28, 2003. Novak then attempted to amend the agreement by filing with the district court a substituted price list that listed all available lots at $62,500, except for two lots at $59,500.[2] On February 5, PIB notified Jamail that it had chosen three lots to purchase, which were listed on the second price list at $62,500 but on the original list at $70,000. PIB specifically stated that it would only purchase the lots for the lower prices. Jamail refused to sell the lots for that price.[3]

---

[1] All but three of the prices listed were handwritten.

[2] This substituted page was identical in form to the original, except that all the prices were typewritten instead of handwritten.

[3] Thus, the total amount in dispute was $22,500, reflecting a $7,500 price difference for each of the three lots.

On February 12, Jamail amended his petition to add a claim that PIB had repudiated the Rule 11 agreement. PIB did not file an answer to the amended pleading but instead filed a "Motion to Enforce" the Rule 11 agreement at the prices listed in Novak's attempted amendment to the price sheet.

During trial, PIB developed evidence showing that on November 22, 2002, Jamail conveyed to a couple, Mark Lind and Sonja Franklin, nineteen of the twenty-seven lots by special warranty deed.[4] Apparently, the parties intended to convey only one lot. This deed was filed with the Travis County Clerk. Sometime in February 2003, the title company, Chicago Title, attempted to correct the deed by filing with the Travis County Clerk an identical copy of the special warranty deed containing handwritten changes. This "corrected" deed is not signed by Jamail, Lind, or Franklin. According to Jamail's trial testimony, the conveyance of nineteen lots to Lind and Franklin was a result of Chicago Title's clerical error and his own failure to read the original deed. In addition, he testified that Chicago Title became aware of the mistake because Lind notified them of it.

After the conclusion of the bench trial, the district court entered judgment in favor of Jamail ordering PIB to purchase three lots according to the Jamail version of the price list and awarding Jamail attorney's fees. It subsequently entered findings of fact and conclusions of law. Among its relevant findings, it determined that Jamail had "substantially completed" the required improvements to the lots by February 11, 2002, that PIB defaulted on the contract by attempting to

---

[4] The conveyance included lots one through ten of block A and lots one through nine of block B.

terminate it, and that the Rule 11 agreement created a new contract between PIB and Jamail. The district court concluded that PIB did not plead any affirmative defenses, including a defense of mistake, to Jamail's claim that PIB repudiated the Rule 11 agreement, that PIB only asserted that the inclusion of the original price sheet in that agreement was as a result of unilateral mistake but that it did not allege fraud, and that the agreement was not ambiguous on its face. Thus, the district court determined that Jamail was entitled to specific performance of the Rule 11 agreement as a matter of law. This appeal followed.

## DISCUSSION

In six issues on appeal, PIB argues that the district court erred: (1) because Jamail failed to plead that he was able to perform under the terms of the Rule 11 agreement; (2) in finding that the Rule 11 agreement created a new contract between Jamail and PIB; (3) in concluding that Jamail substantially completed his duties under the original contract; (4) in determining that PIB did not plead an affirmative defense; (5) because the evidence establishes the existence of a unilateral mistake; and (6) because it was impossible for Jamail to perform under the terms of the agreement on the date of trial.

### *Standards of review*

Because PIB attacks the district court's findings of fact and conclusions of law, we begin with the applicable standards of review.

We review a district court's conclusions of law *de novo* and will reverse if they are erroneous as a matter of law. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d

7

190, 196 (Tex. App.—Austin 1995, no writ).  On the other hand, we attach to a trial court's findings of fact the same weight, force, and dignity that we attach to a jury's findings.  *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Lawyers Sur. Corp. v. Larson*, 869 S.W.2d 649, 653 (Tex. App.—Austin 1994, writ denied).  Findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards used to review jury findings.  *Westech Eng'g, Inc.*, 835 S.W.2d at 195.

In reviewing the legal sufficiency of the evidence, "we must view the evidence in a light that tends to support the disputed finding and disregard evidence and inferences to the contrary."  *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003) (citing *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001)).  A legal sufficiency or "no evidence" point will be sustained when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact.  *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1996).  More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions."  *Havner*, 953 S.W.2d 706, 711 (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995), and *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994)).  If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence.  *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex. 1995).

8

When reviewing a challenge to the factual sufficiency of the evidence, we must consider, weigh, and examine all of the evidence in the record. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442 (Tex. 1989). A party attacking the factual sufficiency of an adverse finding on which the other party had the burden of proof must demonstrate that there is insufficient evidence to support the adverse finding. *Westech Eng'g*, 835 S.W.2d at 196. We should set aside the verdict only if the evidence that supports the finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We may not reverse merely because we conclude that the evidence preponderates toward a different answer. *See Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

### Rule 11 Agreement as "a new legal contract between Jamail and PIB"

We begin with PIB's second issue, in which it argues that the district court erred in determining the Rule 11 agreement created a "new legal contract between Jamail and PIB." In particular, PIB asserts that contract law will not recognize the Rule 11 agreement as a "new contract."

A Rule 11 settlement agreement is a contract and is governed by principles of contract law. *Markowitz v. Markowitz*, 118 S.W.3d 82, 90 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *In re Marriage of Nolder*, 48 S.W.3d 432, 434 (Tex. App.—Texarkana 2001, no pet.); *Montanaro v. Montanaro*, 946 S.W.2d 428, 430 (Tex. App.—Corpus Christi 1997, no writ); *see also Mantas v. Fifth Court of Appeals*, 925 S.W.2d 656, 658-59 (Tex. 1996) (party seeking enforcement of Rule 11 settlement agreement must assert separate breach-of-contract cause of action); *Padilla*

*v. LaFrance*, 907 S.W.2d 454, 461 (Tex. 1995). A settlement agreement is a contract because it resolves a disputed or unliquidated claim by an agreement to make mutual concessions in order to avoid resolving the controversy through a course of litigation. *Priem v. Shires*, 697 S.W.2d 860, 863 (Tex. App.—Austin 1985, no writ). A party who has accepted a settlement offer cannot withdraw from the agreement arbitrarily. *Ortega-Carter v. American Int'l Adjustment Co.*, 834 S.W.2d 439, 442 (Tex. App.—Dallas 1992, writ denied); *Browning v. Holloway*, 620 S.W.2d 611, 615 (Tex. Civ. App.—Dallas 1981, writ ref'd n.r.e.). Once a party accepts the agreement, enforcement is by suit upon the contract, either for breach or for specific performance. *Mantas*, 925 S.W.2d at 658-59; *Stewart v. Mathes*, 528 S.W.2d 116, 119 (Tex. Civ. App.—Beaumont 1975, no writ).

Turning to the filed Rule 11 agreement, in the opening paragraph the parties stated their intention to "memorialize their agreement settling and resolving all issues arising from the facts alleged" in Jamail's original petition. After reciting the terms of PIB's obligation to purchase three lots and Jamail's obligation to finish "construction of the subdivision improvements" and to obtain all government approvals, the parties agreed to dismiss the pending lawsuit and to release all claims against each other within ten days after PIB began construction of a second house on the lots. Considering the language of the document and the context in which it was drafted, we agree with the district court's conclusion that the Rule 11 agreement was a new legal contract.[5] We overrule PIB's second issue.

---

[5] Although PIB complains that the district court erred in labeling its conclusion that the Rule 11 agreement is a contract as a finding of fact, we are not bound by the district court's designations on appeal. *Ray v. Farmers' State Bank*, 576 S.W.2d 607, 608 n.1 (Tex. 1979).

*Pleading requirements to enforce a Rule 11 agreement*

In its first issue, PIB argues that the district court erred in entering judgment for specific performance in favor of Jamail because Jamail failed to plead that he was able to perform according to the Rule 11 agreement. We disagree.

One of the essential elements of the equitable remedy of specific performance is whether the party who seeks specific performance has pleaded and proved that he is ready, willing, and able to perform the contract. *Chessher v. McNabb*, 619 S.W.2d 420, 421 (Tex. Civ. App.—Houston [14th Dist.] 1981, no writ); *Cowman v. Allen Monuments, Inc.*, 500 S.W.2d 223, 227 (Tex. App.—Texarkana 1973, no writ). In this case, Jamail made one promise in the Rule 11 agreement that is relevant to this issue—he warranted "that construction of the subdivision improvements to the lots . . . is finished and all government approvals have been obtained." In his amended pleading filed on February 12, Jamail pleaded that he had "substantially completed the subdivision improvements and satisfied (or, alternatively, substantially satisfied) all conditions precedent to closing at least by" February 11. In other words, Jamail pleaded that he had completed his performance under the terms of the Rule 11 agreement. We find this language sufficient to meet the pleading requirements when seeking specific performance of a contract. We overrule PIB's first issue.

*Evidence of substantial completion*

We now turn to PIB's third issue, in which it contends that the evidence is insufficient to support the district court's finding that Jamail had substantially completed

construction of the subdivision improvements. The district court found that Jamail has "substantially completed, or stood ready, willing, and able to substantially complete, the subdivision improvements and satisfied (or, alternatively, substantially satisfied) or stood ready, willing, and able to substantially satisfy, all conditions precedent to closing by at least" February 12, 2002.[6] PIB instead points to five of the contractual conditions for substantial completion and claims that the evidence establishes that those conditions have not been met.[7]

First, PIB argues that the evidence is insufficient to support the district court's finding of substantial completion of the contract term requiring that each lot "shall be free of construction debris, excavated rock, and boulders and out trees." PIB points to evidence that two lots, comprising over two acres of land, contained boulders and construction debris, some in mounds over ten feet high. However, the record also contains evidence that the City of Austin concluded that the rock in question was needed as fill for low areas on those two lots. Jamail

---

[6] All parties apparently agree that the "substantial completion" terms of the original contract apply to the Rule 11 agreement. The Rule 11 agreement itself mandates that Jamail warrant "that construction of the subdivision improvements to the lots identified in Exhibit A is finished and all government approvals have been obtained."

[7] It is unclear whether the original contract required each condition in the "substantial completion" paragraph to be met for Jamail to have satisfied his responsibilities. We will review the evidence of each condition separately, but we will consider the substantial-performance terms as a whole when we determine the sufficiency of the evidence.

communicated that information to PIB in November or December. At that time, PIB expressed interest in using some of that rock for a subdivision entrance and did not object to Jamail's obedience to the City's directive.

Next, PIB argues that the evidence establishes that it had not given written approval of Jamail's subdivision restrictive covenants and that it had objected to them before Jamail filed them. This, it asserts, violates the contracts' requirement that the restrictive covenants "shall have been (i) approved by [PIB] and (ii) recorded" in Travis County.

There is evidence that Jamail attempted to obtain PIB's written approval of the restrictive covenants but that PIB did not respond and has not expressed any concrete complaint or objection regarding the covenants as filed. In addition, according to the original contract Jamail had the authority to modify the covenants he filed with Travis County. PIB never complained to Jamail about the terms as filed or suggested any alternative terms or language.

Third, PIB asserts that sidewalks had not been constructed according to the terms of the original contract. However, evidence also establishes that the City of Austin would not allow sidewalks to be constructed until after the construction of houses, and Jamail testified that he was ready to install sidewalks as soon as construction was complete.

Fourth, PIB points to Jamail's testimony that he never attempted to create a landscaping maintenance and irrigation license agreement, as required by the substantial completion paragraph in the original contract. We note that the record establishes that the obligation to maintain landscapes and to provide irrigation also fell within the maintenance bond Jamail posted and that Jamail would have to perform under the requirements of that bond for at

least a year. Thus, the evidence supports the conclusion that Jamail's obligations under the bond will require him to perform this term as part of his performance under his bond.

Finally, PIB argues that Jamail had not been released from all his obligations to the City of Austin under his subdivision construction agreement with the City. PIB claims that Jamail failed to substantially complete his obligations under the contract, which required him to produce evidence that PIB would have no obligations or liabilities under that agreement with the City. Jamail points instead to evidence in the record that the City would not release him from his obligations until after the one-year warranty period under the development bond had expired.

We have reviewed the evidence in the record, and, in light of the entire set of conditions in the original agreement and the facts of this case, we determine that the evidence is legally and factually sufficient to support the district court's conclusion that Jamail substantially completed his performance under the contract. We overrule PIB's third issue.

### Affirmative defense of mistake

In its fourth issue, PIB asserts that the trial court erred in concluding that PIB failed to plead an affirmative defense to Jamail's cause of action for specific performance of the Rule 11 agreement. *See* Tex. R. Civ. P. 94. In its fifth issue, PIB insists that the trial court erred in concluding that it could grant relief for a unilateral mistake only upon a showing of fraud. It also contends that there is evidence of mutual mistake, warranting a reversal of the trial court's order.

Assuming without deciding the validity of PIB's fourth issue, that PIB's "motion to enforce" was an answer to Jamail's amended pleading and sufficiently pleaded the affirmative

14

defense of mistake,[8] we will review the trial court's application of the law of mistake to the facts of this case.

In essence, PIB argues that the Rule 11 agreement ought to be reformed or rescinded because the wrong price sheet was attached to the agreement by mistake. Parties to an agreement have a duty to read what they sign. *Salinas v. Beaudrie*, 960 S.W.2d 314, 320 (Tex. App.—Corpus Christi 1997, no pet.); *Torchia v. Aetna Cas. & Sur. Co.*, 804 S.W.2d 219, 224 (Tex. App.—El Paso 1991, writ denied); *see also Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962) ("the party claiming fraud has a duty to use reasonable diligence in protecting his own affairs"). Although mistakes happen, absent fraud in procuring the signing of a contract, unilateral mistake is not grounds for rescinding or setting it aside. *Salinas*, 960 S.W.2d at 320; *Torchia*, 804 S.W.2d at 224-25. Even when one court indicated it would consider setting aside a release because of unilateral mistake if due diligence was shown, an absence of due diligence was shown by failure to read the document presented. *See Torchia*, 804 S.W.2d at 225 (considering *Pack v. City of Fort Worth*, 552 S.W.2d 895 (Tex. Civ. App.—Fort Worth), *writ ref'd n.r.e.*, 557 S.W.2d 771 (Tex. 1977)).

In this case, negotiations resulted in a settlement agreement. Both parties agreed that PIB would purchase three lots from Jamail's "current price list." When finalizing the documents for

---

[8] PIB indicates that it filed a "motion to enforce the Rule 11 agreement" on March 11, 2003, in which it petitioned the court to disregard the price list as originally attached to the agreement and to substitute the earlier price list. In the alternative, PIB moved to strike the Rule 11 agreement because the parties "did not reach a meeting of the minds concerning an essential element of the agreement," the purchase price of the lots. Thus, PIB contends that it pleaded an affirmative defense to Jamail's cause of action. Although it is ambiguous whether PIB actually identified "mistake" as its defense in the "motion," we will assume it did.

15

filing with the district court, PIB's attorney, Novak, noticed that he did not have a copy of Jamail's "current price list." He called Jamail's attorney, who then faxed over a price list. Novak attached that price list to the agreement and filed both documents with the district court. Neither Novak nor any officer from PIB specifically reviewed the price list before attaching it to the Rule 11 agreement and filing it. Neither does the record reflect, either by testimony or through a reading of the Rule 11 agreement, that the parties ever explicitly identified a particular "current price list" except by reference to it as an attachment to the agreement. In addition, correspondence between the parties during settlement negotiations referred to "current marketing prices," "current price list," and "$70,000." None of the correspondence refers to a "December 2002 price list." In fact, on January 27, 2003, Novak faxed PIB's final settlement proposal to Jamail's attorney and attached a price list identical to the one he ultimately filed with the district court. As well, a full two days elapsed between Novak's receipt of the price list from Jamail's attorney and Novak's filing of the Rule 11 agreement with the district court. Despite PIB's assertion that Jamail "slip[ped] a material revision of the parties' actual agreement past PIB's attorney through the dubious ruse of purporting to provide" the earlier price list, the record does not offer evidence to support any act of fraud on Jamail's part. Neither Novak's nor PIB's unilateral mistake can form the basis for reforming or rescinding the Rule 11 agreement in this case.

PIB further contends that a mutual mistake occurred in this case, warranting a voiding of the agreement. *See Wallerstein v. Spirt*, 8 S.W.3d 774, 780-81 (Tex. App.—Austin 1999, no pet.) (mutual mistake is defense to contract claim); *Volpe v. Schlobohm*, 614 S.W.2d 615, 618 (Tex. Civ. App.—Texarkana 1981, no writ) (mutual mistakes need not be same mistake by both

parties). In essence, PIB argues that the Rule 11 agreement does not reflect the actual agreement made by both parties. Given the evidence we have just reviewed, we disagree. If anything, the evidence establishes that Jamail consistently referred to $70,000 as the price for the lots. We overrule PIB's fifth issue.[9]

*Impossibility*

In its final issue, PIB asserts a defense of impossibility, claiming that on November 22, 2002, Jamail had already conveyed title to Lind and Franklin for all but four of the lots PIB could purchase. Thus, PIB claims it should not be required to perform under the Rule 11 agreement because Jamail was unable to perform under its terms at the time of trial.[10] In essence, PIB offers an original impossibility argument, resting on Jamail's alleged inability to offer PIB eighteen lots from which to choose under the terms of the Rule 11 agreement. *See Janak v. Federal Deposit Ins. Corp.*, 586 S.W.2d 902, 906 (Tex. Civ. App.—Houston [1st Dist.] 1979, no writ) (original impossibility); *see also* Restatement (Second) of Contracts § 266 & cmt. a (1981) ("Impracticability of Performance and Frustration of Purpose").

---

[9] Because we overrule PIB's fifth issue, we need not address the merits of its fourth issue.

[10] PIB did not raise an impossibility defense in its pleadings. When it sought to introduce evidence on the issue during trial, the district court overruled Jamail's objections. Jamail does not present any issues on appeal.

17

Assuming that the Chicago Title's attempted "correction" of the special warranty deed was insufficient to clarify that Jamail retained title to the lots in question,[11] we disagree with PIB's contention that the recorded deed renders Jamail's performance impossible. According to the terms of the Rule 11 agreement, PIB had an obligation to purchase three lots from the eighteen then available. Even though Chicago Title's attempt to correct the special warranty deed may not have been effective, the record establishes merely that all but eight of those currently have a cloud on Jamail's title to them because of the special warranty deed.[12] For Jamail to be able to effectively convey the lots PIB ultimately chooses, Jamail must clarify his title. His need to clarify the title, however, does not render his performance impossible. We overrule PIB's final issue.

---

[11] A correction deed is executed and recorded for the unique purpose of correcting a scrivener's error in the description of the property. *Joe T. Garcia's Enters., Inc. v. Snadon*, 751 S.W.2d 914, 916 (Tex. App.—Dallas 1988, writ denied); *see also Wilson v. Dearing, Inc.*, 415 S.W.2d 475, 476 (Tex. Civ. App.—Eastland 1967, no writ) (correction deed corrected erroneous description of land in former instrument); *Parker v. McKinnon*, 353 S.W.2d 954, 955 (Tex. Civ. App.—Amarillo 1962, writ ref'd n.r.e.) (correction deed executed to correct errors in former deed omitting state and county descriptions, misspelling survey description and providing corrected volume number of original patent); *Fenn v. Boxwell*, 312 S.W.2d 536, 541 (Tex. Civ. App.—Amarillo 1958, writ ref'd n.r.e.) (correction deed executed to reflect grantor's conveyance of lot in Block 122 instead of Block 102, where he owned no property). Corrections may be made by cancellation or rescission of the conveyance by mutual consent. *Snadon*, 751 S.W.2d at 916.

[12] The special warranty deed "conveys" to Lind and Franklin some lots listed on the "current price list" as sold, sales pending, or reserved. Only ten of the lots "conveyed" to Lind and Franklin were listed as available.

18

**CONCLUSION**

We have overruled PIB's first, second, third, fifth and sixth issues. Because we overruled PIB's fifth issue on the merits, we have no need to consider its fourth issue. We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Kidd, B. A. Smith and Pemberton

Affirmed

Filed: December 16, 2004

19