# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00501-CV

---

**Tony Dinwiddie, Appellant**

**v.**

**Margaret Danielle Pottin and Jennifer Ann Francis, Appellees**

---

### FROM THE 169TH DISTRICT COURT OF BELL COUNTY
### NO. 323928, THE HONORABLE CARI L. STARRITT-BURNETT, JUDGE PRESIDING

---

## DISSENTING OPINION

Tony Dinwiddie relinquished his parental rights to his son, K.J., based on statements that were made to him by Margaret Danielle Pottin, who Dinwiddie trusted "like a mother" and who wanted to adopt his child. I would conclude that Pottin's statements were false and misleading and, under the circumstances of this case, amounted to fraud. Because the majority concludes otherwise, I dissent.

"The natural right existing between parents and their children is of constitutional dimensions." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). "A termination decree is complete, final, irrevocable and divests for all time that natural right" existing between parent and child "as well as all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit." *Id*. "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly

construed in favor of the parent." *Id.*; *see also In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018) ("Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection."); *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) ("A parental rights termination proceeding encumbers a value 'far more precious than any property right' and is consequently governed by special rules." (quoting *Santosky v. Kramer*, 455 U.S. 745, 758 (1982))).

"Under the Family Code, a trial court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that termination is in the best interest of the child and that the parent has executed a valid, irrevocable affidavit of relinquishment of parental rights." *In re K.M.L.*, 443 S.W.3d 101, 108 (Tex. 2014) (citing Tex. Fam. Code § 161.001(1)(K), (2)). The party petitioning for termination "has the burden to prove the elements necessary to support termination of the parent-child relationship," *id.* at 113, and "[i]n parental termination cases, due process requires application of the clear and convincing standard of proof," *id.* at 112 (citing *Santosky*, 455 U.S. at 769; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007.

"Section 161.103 of the Family Code provides a litany of requirements that must be met for the affidavit of voluntary relinquishment of parental rights to form the basis for termination of the parent-child relationship under section 161.001(1)(K)," *K.M.L.*, 443 S.W.3d at 108, including that the affidavit be "witnessed by two credible persons" and "verified before a person authorized to take oaths," *see* Tex. Fam. Code § 161.103(a)(2), (3). Additionally, "Section 161.103 requires that the affidavit be for *voluntary* relinquishment, and implicit in

2

section 161.001(1)(K) is the requirement that the affidavit of parental rights be voluntarily executed." *Id*. at 113 (internal citation omitted). "An involuntarily executed affidavit is a complete defense to a termination suit based on section 161.001(1)(K)." *Id*.

Under the statutory framework, "a person seeking to terminate parental rights based on an affidavit of relinquishment has the initial burden of proving, by clear and convincing evidence, that the affidavit was executed in accordance with section 161.103's requirements." *Moore v. Brown*, 408 S.W.3d 423, 437 (Tex. App.—Austin 2013, pet. denied). "An affidavit of relinquishment in proper form is itself prima facie evidence of its validity." *Id*. "And, once that burden is met, the longstanding rule has been that the affidavit may be set aside only on proof that the affidavit was executed as a result of 'fraud,' 'coercion,' 'duress,' or related factors going ultimately to whether the waiver of parental rights in the affidavit was made voluntarily, knowingly, intelligently, and with full awareness of the legal consequences, as is constitutionally required." *Id*.; *see also* Tex. Fam. Code § 161.211(c) ("A direct or collateral attack on an order terminating parental rights based on an unrevoked affidavit of relinquishment of parental rights . . . is limited to issues relating to fraud, duress, or coercion in the execution of the affidavit."). "In determining whether fraud existed in the execution of an affidavit of relinquishment, courts look to the circumstances surrounding its execution." *In re K.D.*, 471 S.W.3d 147, 157 (Tex. App.—Texarkana 2015, no pet.).

The circumstances surrounding the execution of the affidavit of relinquishment in this case are as follows. Dinwiddie signed the affidavit on August 5, 2021, and it was filed in the trial court on August 26, 2021. At the time the affidavit was signed and filed, Dinwiddie was not represented by counsel. Nor was Dinwiddie represented by counsel when, five days after the

3

affidavit was filed, he wrote a letter to the trial court stating his "intent of NOT relinquishing [his] rights" to K.J.  Specifically, Dinwiddie wrote,

> I signed the relinquishing paper under duress and pressure the first day it was presented to me.  Ms. Pottin informed me that the paper was reversible thus why I signed, instead of allowing myself the proper time to talk with my mother and father about what was going on.  The true purpose for me signing the paper was for the promise of use of the GI bill for when [K.J.] is ready for college.  I was told by Ms. Pottin that I would still have all the rights and that this process would be needed to be done in order for her to be able to give him an education.  She made it abundantly clear that I would still be dad and still have say so.

Dinwiddie continued to oppose the termination of his parental rights at the September 30, 2021 termination / adoption hearing.  At the hearing, Dinwiddie acknowledged that he had read the affidavit but said that he signed it "kind of on a trust-basis system" and that it was "more for kind of guaranteed use of GI Bill for [the] financial benefit" of K.J.  Dinwiddie explained, "I was informed that the paper was reversible, and that if I didn't like the process that was going on, that we could terminate what was going on.  I was basically misinformed."  When the trial court told Dinwiddie that the affidavit recited that he had signed it voluntarily, Dinwiddie responded, "Like I said, I was under the belief that I was still going to be the father and I was going to be the main caregiver."  Dinwiddie explained further:

> I just feel like I didn't—I didn't get the proper time to go over the paper that I signed.  And I understand that I felt bullied and pressured to do it that day because I had undeniable trust for Ms. Pottin.  And, you know, I—I mean, I didn't want to lose my rights as a father.  I never did agree to that.  Whenever I signed the paper, I made it a point that I wasn't going to abide by it. And she said, It's okay, we're just going to do this for the schooling.  But she said that you would be dad and you would have the responsibility of being his father still.

When asked if he understood that he had not complied with the legal requirements for revoking his affidavit, Dinwiddie responded, "I don't understand how this process works." After again being told that he signed the affidavit, Dinwiddie testified,

> Like I say, I signed this because I had 100 percent trust for Ms. Pottin, because she was doing a good job taking care of my son. But like I said, I was under agreement that I would still be the dad, and I would have all of the rights. Like— I was informed that it was just simply doing this for him to have a college education after school.

He added, "That's what I was told and that's what I was promised. There was nothing more."

Pottin testified that Dinwiddie had followed her to the UPS store where he signed the affidavit and that they waited there in a "long line" together, "lean[ing] next to each other." Dinwiddie told Pottin that "he didn't know if he was going to be able to stay . . . because . . . he was running late" for work, but Pottin told him, "Well, Tony, then wait a couple of more people and see. And if not, you can leave." When asked if she and Dinwiddie had "a conversation about whether or not [he] would be able to revoke" the affidavit, Pottin testified,

> Yes, he did ask about it. And clearly it states on the paper. So I gave him—I told him, yeah, it can be revoked, Tony. It can go back. Nothing has changed as you being a father. He's like—all of this time, in the age, he's like a son honestly. That's—like my grandchild, having Tony is like my son.

On October 1, 2021, the trial court signed its order terminating Dinwiddie's parental rights and granting the adoption for Pottin and her wife. That same day, Dinwiddie wrote a letter asking the trial court to reconsider its decision, and by October 15, 2021, Dinwiddie had obtained an attorney who filed an amended motion for new trial.

5

At the November 18, 2021 hearing on the motion for new trial, Dinwiddie testified that he and Pottin had discussed adoption because Pottin "wanted to pass the GI Bill to [K.J.]. She said that she wanted us to be able to provide him with a college education down the line, and that was the only reasoning for the adoption." However, Pottin promised Dinwiddie "that [he] would be the father, and that [he] would be the main provider at all times." Dinwiddie testified that Pottin had promised him "throughout" the process that he would continue to see his son: "Before even I signed the papers, throughout, and during me signing the paper, she had always assured that it was just for passing the GI Bill and that was it. I wasn't—I was going to still continue to be the father and the main provider." When he asked Pottin about the language in the affidavit reciting that it terminates his parental rights, that it was irrevocable, and that an adoption could take place, Pottin's "response was I would still be the father, period. I would still be the main provider and that nothing will change. She promised that nothing would change at all." Dinwiddie testified that he "absolutely" relied on Pottin's promises and assurances when he completed the document because "she was like a mother" to him and he had "no reason not to doubt her."

Pottin testified that when Dinwiddie executed the affidavit, he was still able to see K.J. and that she and her spouse had told Dinwiddie that this would continue, even after his rights were terminated. The following testimony was elicited:

Q. Assurances were made that that would continue even after the termination that occurred on September the 30th; is that correct?

A. Yes.

Q. So in other words, at the time that Mr. Dinwiddie executed his affidavit,

6

he was being told by both you and your spouse that he would continue to have a father relationship with [K.J.]; is that correct?

A. Yes.

. . . .

Q. So it's a fair statement and an accurate statement that at the time that Mr. Dinwiddie executed his affidavit—

A. Uh-huh.

Q. —he was being told that he would still have father access to his child?

A. Yes.

Q. That he would still be a father to that child; is that correct?

A. Yes.

Q. Notwithstanding what that affidavit said; is that correct?

A. Correct.

Q. And so you've read the affidavit that Mr. Dinwiddie executed; is that correct?

A. Yes.

Q. And you know that it states in there basically words to the effect of this terminates your parental rights forever by executing this; is that correct?

A. Yes.

7

Q.   Mr. Dinwiddie was told by you that something else was going to happen, that he would actually maintain that father relationship with the child; is that correct?

A.   Yes.

Q.   And you never did anything from August the 5th through September the 30th to correct that; is that correct?

A.   I don't understand your question.

Q.   In other words, you never told Mr. Dinwiddie at any time between August the 5th and September 30th that that is not what's going to happen. Instead, he was going to be cut off. You never told him that, did you?

A.   No.

In summary, Pottin told Dinwiddie prior to executing the affidavit of relinquishment that it "can be revoked" and "can go back" and that "[n]othing has changed as you being a father." She also agreed that "assurances were made" to Dinwiddie that he would continue to be able to see K.J. even after his rights were terminated, that he would continue to have a "father relationship" with him, that he would continue to have "father access," and that he would continue to be "a father to that child."

These statements were false and misleading. The affidavit provided that it was "irrevocable for 60 days." Although it could be revoked after 60 days, Dinwiddie's parental rights to his child could be, and in fact were, terminated within that time. The affidavit also provided that Dinwiddie was executing the affidavit "with the intention to aid in the termination of any parental rights [he] possess[es]," that "a court case to terminate the parent-child relationship between [Dinwiddie] and [K.J.] has been filed," and that "upon execution of this

8

document, a court can render an order terminating [his] parental rights and barring [him] from asserting any rights as the father of" the child.

Upon termination of his parental rights, Dinwiddie would no longer be the father of K.J., and executing the affidavit of relinquishment provided statutory grounds for termination. *See* Tex. Fam. Code § 161.001(1)(K). Pottin, who unlike Dinwiddie was represented by counsel throughout the proceedings, knew this. Yet when Dinwiddie asked Pottin about the effect of the affidavit, she told him that "[n]othing has changed as you being a father." However, a termination decree changes everything regarding one's being a father, at least with the child who is the subject of the decree. *See Holick*, 685 S.W.2d at 20 ("A termination decree is complete, final, irrevocable and divests for all time that natural right" existing between parent and child "as well as all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit."). Pottin's statements went beyond telling Dinwiddie that he could still visit the child or play some role in the child's life. Rather, they communicated to Dinwiddie that he would remain the child's father.

Dinwiddie relied on those statements in executing the affidavit of relinquishment. At the termination hearing, Dinwiddie testified that he signed the affidavit "kind of on a trust-basis system" and that it was "more for kind of guaranteed use of GI Bill for [the] financial benefit" of K.J. Dinwiddie explained, "I was informed that the paper was reversible, and that if I didn't like the process that was going on, that we could terminate what was going on." Dinwiddie further testified that he had "undeniable trust for Ms. Pottin," that he "didn't want to lose [his] rights as a father," and that when he signed the affidavit and "made it a point that he wasn't going to abide by it," Pottin told him, "It's okay, we're just going to do this for the schooling," and that Dinwiddie "would be dad" and "would have the responsibility of being his

9

father still." At the new-trial hearing, Dinwiddie testified that when he asked Pottin about the language in the affidavit reciting that it would terminate his parental rights, that it was irrevocable, and that an adoption could take place, Pottin's "response was [he] would still be the father, period. [He] would still be the main provider and that nothing will change. She promised that nothing would change at all." He also testified that he "absolutely" relied on Pottin's promises and assurances when he executed the affidavit because "she was like a mother" to him and he had "no reason not to doubt her."

Under the circumstances in this case, Pottin's false and misleading statements amounted to fraud. "At common law, fraud refers to 'an act, omission, or concealment in breach of a legal duty, trust, or confidence justly imposed, when the breach causes injury to another or the taking of an undue and unconscientious advantage.'" *Jones v. Texas Dep't of Protective & Reg. Servs.*, 85 S.W.3d 483, 491 (Tex. App.—Austin 2002, pet. denied) (quoting *Vela v. Marywood*, 17 S.W.3d 750, 760 (Tex. App.—Austin 2000, pet. denied)). "It may consist of both active misrepresentation and passive silence" and includes "both actual and constructive fraud." *Id.* "Actual fraud encompasses dishonesty of purpose or intentional breaches of duty that are designed to injure another or to obtain an undue and unconscientious advantage." *Id.* (citing *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964); *Vela*, 17 S.W.3d at 761). "Constructive fraud, on the other hand, is a breach of duty that the law declares fraudulent, regardless of the actor's intentions, because it tends to deceive others, violates confidences, or causes injury to public interest." *Id.* "A false representation of a past or present material fact, when one has a duty to speak the truth, is a frequent ground for recovery in fraud when another relies on the representation to [his] detriment, even in an ordinary arms-length transaction where

10

only the ethics of the marketplace apply." *Vela*, 17 S.W.3d at 761 (citing *Chien v. Chen*, 759 S.W.2d 484, 495 (Tex. App.—Austin 1988, no writ)).

"A 'legal duty' may arise from several sources, including moral, social, domestic, or purely personal relationships—relationships where 'the law demands of one party an unusually high standard of ethical or moral conduct with reference to another.'" *Jones*, 85 S.W.3d at 491 (quoting *Chien*, 759 S.W.2d at 494 n.6). "A legal duty may exist if it is established that one has placed special confidence in another, thereby giving that person a position of superiority and influence." *Id*. at 492 (citing *Vela*, 17 S.W.3d at 760–61). "A legal duty may also be present where, because of family relationship or otherwise, a person is accustomed to being guided by the judgment or advice of another or is justified in placing confidence in the belief that the other will act in the interest of that person." *Id*. (citing *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)). "Finally, when a party undertakes to speak, that party assumes a duty to tell the whole truth." *Id*. (citing *Vela*, 17 S.W.3d at 761).

Here, Pottin's statements must be evaluated in the context of the rights that were at stake and the relationship between the parties. Dinwiddie was not executing a sales contract for goods or services in which "the ethics of the marketplace apply." Rather, he was executing an affidavit relinquishing his parental rights to his child, rights that have been characterized by the courts as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick*, 685 S.W.2d at 20. Pottin, who wanted to adopt Dinwiddie's child, stood to benefit from that relinquishment. Additionally, Pottin testified that Dinwiddie was "like [a] son" to her, and Dinwiddie testified that Pottin was "like a mother" to him. Thus, it is undisputed that Pottin and Dinwiddie had a relationship akin to that of mother and son in which Dinwiddie placed special confidence in Pottin, giving her a position of "superiority and influence" over his

11

decisions, particularly those decisions regarding his child because of the prominent role that she had played in caring for that child. Given the personal nature of their relationship, and considering that Pottin chose to speak and advise Dinwiddie on the effects of the affidavit before he signed it, Pottin assumed a legal duty to tell Dinwiddie the whole truth regarding the affidavit—that it would be irrevocable for 60 days; that within that time, his parental rights would likely be terminated; and that after his rights were terminated, he would no longer be the child's father or have any right to raise or even visit his son. Pottin did not tell Dinwiddie any of that. In fact, with her words and assurances, she led him to believe the opposite.

I would conclude that Dinwiddie proved that he executed the affidavit of relinquishment as a result of fraud committed by Pottin, and I would reverse the trial court's order terminating Dinwiddie's parental rights. *See Vela*, 17 S.W.3d at 761–64 (concluding that affidavit of relinquishment was wrongfully procured when adoption agency made statements to mother regarding visitation that were misleading "half-truths" that "stop[ped] short of complete disclosure"). Because the majority does not, I dissent.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Filed: April 15, 2022

12